UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 99-1665
(CA-95-129-3)

Local Union No. 666, etc.,

Plaintiff - Appellant,

versus

Stokes Electrical Service, Inc.,

Defendant - Appellee.

O R D E R

The court amends its opinion filed August 8, 2000, as follows:

On page 2, section 3, lines 5-6 -- "Anessa Adams" is corrected to read "Anessa Abrams."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

LOCAL UNION NO. 666,
INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, AFL-CIO,
Plaintiff-Appellant,

v.

STOKES ELECTRICAL SERVICE,
INCORPORATED,
Defendant-Appellee.

NATIONAL ELECTRICAL CONTRACTORS
ASSOCIATION, INCORPORATED,

No. 99-1665

Amicus Curiae,

and

LOCAL UNION NO. 666,
INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS BENEFIT TRUST
FUND; CHARLES P. WILSON, Trustee;
LARRY R. JARVIS, Trustee; JAMES H.
UNDERWOOD, Trustee; LAWRENCE R.
MOTER, JR., Trustee; MELVIN A.
MCGUINN, Trustee,
Movants.

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
James R. Spencer, District Judge.
(CA-95-129-3)

Argued: April 6, 2000

Decided: August 8, 2000

Before WILKINS and MICHAEL, Circuit Judges, and
Patrick M. DUFFY, United States District Judge for the
District of South Carolina, sitting by designation.

_____

Reversed and remanded by published opinion. Judge Michael wrote
the opinion, in which Judge Wilkins and Judge Duffy joined.

_____

**COUNSEL**

**ARGUED:** Terry Russell Yellig, SHERMAN, DUNN, COHEN,
LEIFER & YELLIG, P.C., Washington, D.C., for Appellant. Gary L.
Lieber, SCHMELTZER, APTAKER & SHEPARD, P.C., Washing-
ton, D.C., for Amicus Curiae. Michael Peter Oates, HUNTON &
WILLIAMS, Richmond, Virginia, for Appellee. **ON BRIEF:** Anessa
Abrams, SCHMELTZER, APTAKER & SHEPARD, P.C., Washing-
ton, D.C., for Amicus Curiae. Barry T. Meek, HUNTON & WIL-
LIAMS, Richmond, Virginia, for Appellee.

_____

**OPINION**

MICHAEL, Circuit Judge:

Local Union No. 666, International Brotherhood of Electrical
Workers, AFL-CIO (Local 666 or the Union) sued Stokes Electrical
Service, Inc. (Stokes or the Company) under Section 301 of the Labor
Management Relations Act (LMRA), 29 U.S.C. § 185, to enforce two
interest arbitration awards that directed Stokes to implement new
labor contracts. The parties submitted the case on cross-motions for
summary judgment, and the district court granted judgment to Stokes,
refusing to enforce the awards. We reverse. Although Stokes' good-
faith doubt about the Union's majority status relieved the Company
of its statutory duty to bargain, that did not free the Company of its
contractual obligation to submit to interest arbitration. We remand for
enforcement of the awards.

I.

The relationship between Stokes and Local 666 is governed both by contract and by statute. For that reason, we will mention certain National Labor Relations Act (NLRA or the Act) provisions and case law as we recite the stipulated facts, contract terms, and history of the case.

An employer is obligated under section 8(a)(5) of the NLRA, 29 U.S.C. § 158(a)(5), to bargain with a union that has been "designated or selected," in the words of section 9(a), 29 U.S.C. § 159(a), "for the purposes of collective bargaining by the majority of the employees." As a general rule, it is an unfair labor practice under sections 8(a)(1) and (2) for an employer, and under section 8(b)(1)(A) for a union, to enter into a collective bargaining agreement when only a minority of employees has chosen the union as its bargaining representative. See American Automatic Sprinkler Sys., Inc. v. NLRB, 163 F.3d 209, 214 (4th Cir. 1998), cert. denied, 120 S. Ct. 65 (1999). However, under section 8(f) there is an exception for the construction industry because of special factors, such as the "uniquely temporary, transitory, and sometimes seasonal nature" of much of the work in that industry. Jim McNeff, Inc. v. Todd, 461 U.S. 260, 266 (1983). Specifically, section 8(f) allows employers and unions in the construction industry to enter into labor agreements (commonly called "prehire" agreements) before a majority of employees has approved the union as its bargaining representative. See 29 U.S.C. § 158(f). These section 8(f) agreements are voluntary, see Jim McNeff, 461 U.S. at 269, and under this circuit's law "a pre-hire agreement may be repudiated by either party prior to the union's achievement of majority status." Industrial TurnAround Corp. v. NLRB, 115 F.3d 248, 254 (4th Cir. 1997). An 8(f) construction union is not required to achieve 9(a) status, and it may do so "only through the traditional means available to unions in nonconstruction industries." American Automatic Sprinkler, 163 F.3d at 218. Thus, an 8(f) union may attain full 9(a) status"through either Board-certified election or voluntary recognition based upon a clear showing of majority support." Id. at 217. Once the union has 9(a) status, all of the benefits and obligations of the NLRA are triggered, both for the union and the employer.

3

Stokes, the employer in this case, is an electrical contractor, and Local 666 is a labor organization. Stokes and Local 666 are involved in the construction industry, and both are based in Richmond, Virginia. The National Electrical Contractors Association (NECA) is a trade association authorized by its members to engage in multiemployer collective bargaining.[1] NECA is organized into chapters, one of which is the Virginia Chapter. On August 25, 1986, Stokes signed "letters of assent" authorizing the Virginia Chapter of NECA to act as its representative for collective bargaining with Local 666. In signing the letters of assent, Stokes became bound to "Inside Construction" and "Residential Construction" collective bargaining agreements between the Virginia Chapter of NECA and Local 666. At that stage, Local 666 was an 8(f) union insofar as its relationship with Stokes was concerned.

Local 666 remained an 8(f) union until March 11, 1991, when it attained 9(a) status. On that day Stokes executed an agreement voluntarily recognizing the Union as the exclusive collective bargaining agent for its electrical employees. This was done after a majority of these employees signed authorization cards. Stokes also signed new letters of assent with NECA on March 11, 1991. Thereafter, while Local 666 was a 9(a) majority representative, Stokes committed itself to new "Inside" and "Residential" collective bargaining agreements, effective from September 1, 1992, through August 31, 1994 (the "1992-94 Agreements" or the "Agreements").

All of the labor agreements to which Stokes was bound, including the 1992-94 Agreements, contained provisions for interest arbitration. (Interest arbitration covers "'disputes over the formation of collective agreements or efforts to secure them.'" Local Union No. 637, IBEW v. Davis H. Elliot Co., Inc., 13 F.3d 129, 133 (4th Cir. 1993) (quoting Elgin, J. & E.R. Co. v. Burley, 325 U.S. 711, 723 (1945)).) Section 1.02(a) in each of the 1992-94 Agreements provides that either party desiring to change or terminate the Agreement must notify the other at least 90 days prior to the anniversary date. A notice of desire to terminate is handled in the same way as a proposed change. Negotiation is contemplated in both instances. Under section 1.02(d) any unre-

_____

[1] NECA is amicus curiae in this appeal, and it argues for the enforcement of the interest arbitration awards.

4

solved issues in negotiations may be submitted jointly or unilaterally to the Council on Industrial Relations (CIR) for adjudication. The CIR is an interest arbitration panel for the electrical contracting industry; the panel is made up of twelve members, six appointed by the NECA and six by the IBEW. CIR rulings must be unanimous.

On March 14, 1994, Stokes withdrew from the NECA and revoked the authority of NECA's Virginia Chapter to act as its bargaining agent. On May 9**2** Stokes wrote to Local 666, serving notice that the Company intended to terminate the 1992-94 Agreements upon their expiration on August 31. On June 2 Local 666 notified Stokes by letter that it wished to negotiate new agreements in accordance with the terms of the 1992-94 Agreements. With its letter the Union included drafts of successor agreements with the proposed changes highlighted. On June 7 a majority of Stokes' electrical employees said, in a signed statement handed to the Company, that it (the majority) no longer wished to be represented by Local 666. Thereafter, on June 13 Stokes told Local 666 that it no longer believed the Union represented a majority of the Company's employees and that it was filing a petition for an election with the National Labor Relations Board (Board or NLRB) to resolve the question of the Union's status. The next day, Stokes filed a petition for an election. Relying on these circumstances, the Company refused to bargain with the Union on the terms of successor agreements.

On July 13 the Union filed an unfair labor practice charge with the Board alleging that Stokes had unlawfully refused to bargain in violation of section 8(a)(5) of the NLRA. The Regional Director for the NLRB dismissed the Union's charge on July 29, finding that Stokes' "refusal to bargain [was] based upon a good-faith doubt of the Union's majority status." Local 666 did not appeal. On August 5 the Regional Director also dismissed Stokes' petition for election, finding that the question concerning representation was rendered moot by his July 29 dismissal of the Union's unfair labor practice charge. Neither side appealed.

Meanwhile, on July 18 Local 666 had (by letter) invited Stokes to submit unresolved bargaining issues to the CIR for interest arbitra-

_____

**2** The dates are all in 1994, unless otherwise indicated.

tion. The Union took the position that under the 1992-94 Agreements "any bargaining issues that remain[ed] unresolved on July 20, 1994, [could] be submitted jointly or unilaterally by the parties to the [CIR] for binding interest arbitration." Stokes responded that it intended to comply with "the current collective bargaining agreements until their expiration on August 31, 1994," but that "absent a statutory duty to bargain with the union, Stokes Electrical Service has no duty to negotiate successor agreements."

On August 1 the Union unilaterally submitted the unresolved issues to the CIR for adjudication, and the CIR held a hearing on the Union's submission on August 16. Stokes declined to participate in the hearing, asserting that the CIR lacked jurisdiction. On August 31 the CIR issued two interest arbitration awards directing the parties to sign and implement new labor agreements that were attached to the awards. The new agreements were to be effective from September 1, 1994, through November 30, 1996 ("1994-96 Agreements" or the "new Agreements"). Stokes has not signed or complied with the new Agreements.

After Stokes filed unfair labor practice charges against Local 666 on August 31 and October 19, the General Counsel of the NLRB issued a complaint against the Union. The General Counsel alleged that the Union violated section 8(b)(1)(B) of the NLRA by invoking interest arbitration and thereby coercing Stokes in its selection of its bargaining representative after it had withdrawn from NECA and after the Company no longer had a statutory duty to bargain with the Union. The General Counsel also alleged that the Union violated section 8(b)(1)(A) by attempting through interest arbitration to coerce Stokes' employees in the selection of their collective bargaining representative. The parties submitted the case to the Board on stipulated facts. On August 27, 1998, the Board issued a decision dismissing the General Counsel's complaint and holding that he had "failed to establish that the Respondent Union had no reasonable basis for pursuing the unresolved bargaining issues through interest arbitration." IBEW, Local Union No. 666 (Stokes Electrical), 326 N.L.R.B. 44, 1998 WL 568289, at *6 (1998).

Earlier, on February 16, 1995, Local 666 had filed this case against Stokes under section 301 of the LMRA to enforce the two interest

6

arbitration awards. The district court stayed the case pending the NLRB's decision on the General Counsel's complaint against the Union. After the Board rendered its decision in favor of the Union on August 27, 1998, the stay in district court was lifted, and the parties filed cross-motions for summary judgment. The district court held for Stokes, refusing to enforce the arbitration awards. The court concluded that when Local 666 attempted to submit unresolved issues to the CIR on August 1, 1994, "Stokes no longer had any <u>statutory</u> duty to bargain with the Union over successor agreements to the 1992-94 Agreements." The court then concluded that the Union "had no independent contractual right to demand interest arbitration once Stokes' [statutory] duty to bargain with it had been extinguished." Local 666 appeals, and we review the district court's grant of summary judgment de novo, see <u>GTE South, Inc. v. Morrison</u>, 199 F.3d 733, 745 (4th Cir. 1999).

II.

The question is whether Stokes is bound by the interest arbitration clause in the 1992-94 Agreements. We conclude that it is and that the CIR's arbitration awards directing Stokes to implement the new 1994-96 Agreements must be enforced.

A.

Stokes first argues that the interest arbitration provisions of the 1992-94 Agreements do not apply when notice of the "desire to terminate" an agreement has been given, as it was here. Because "the issue of whether parties have agreed to arbitrate [is] a judicial one," we apply "traditional principles of contract interpretation" to determine the meaning of interest arbitration clauses. <u>Local Union No. 637, IBEW v. Davis H. Elliot Co., Inc.</u>, 13 F.3d 129, 133 (4th Cir. 1993). A straightforward reading of the contract language reveals that an unresolved issue over the desire to terminate the Agreements may be submitted to the CIR for adjudication.

Section 1.02(a) of the 1992-94 Agreements provides that either party "desiring to <u>change or terminate</u> [the Agreements] must notify the other, in writing, at least 90 days prior to the anniversary date." (emphasis added). Under section 1.02(d) "[u]nresolved issues in

7

negotiations . . . may be submitted jointly or unilaterally by the parties [to the CIR] for adjudication." Finally, section 1.02(f) explicitly provides that "[n]otice by either party of a desire to terminate [the agreement] shall be handled in the same manner as a proposed change." See also Davis H. Elliot, 13 F.3d at 133 n.4 (concluding that an identical version of section 1.02(f) in an earlier NECA-IBEW agreement meant that "termination of the agreement is subjected . . . to the same procedures that govern proposed changes"). Consequently, section 1.02(d)'s reference to "unresolved issues in negotiations" covers negotiations over both a request to terminate and a request to change an agreement. These "unresolved issues" are subject to interest arbitration, at least insofar as the plain language of the Agreements is concerned. As a result, Stokes' notice of a "desire to terminate" the Agreements did not relieve it of its contractual duty to submit to interest arbitration for successor agreements.

Before we leave the contract issue, we note that Stokes did not repudiate or void the 1992-94 Agreements. Stokes advised the Union that it would comply with the Agreements until they expired.

B.

Stokes begins its second argument by pointing out that it was relieved of its statutory duty to bargain with Local 666 when the Regional Director dismissed the Union's unfair labor practice charge, finding that the Company's "refusal to bargain [was] based upon a good-faith doubt of the Union's majority status." Stokes argues that once it was relieved of its statutory duty to bargain, it was also relieved of its contractual duty to submit to interest arbitration with the Union. This argument fails because the Board and the courts have been careful to distinguish between statutory obligations under the NLRA and the contractual obligation to engage in interest arbitration.

We look first at the Board case of IBEW Local No. 113 (Collier Electric), 296 N.L.R.B. 1095, 1989 WL 224423 (1989). The issue was whether the union violated sections 8(b)(1)(B) and (b)(3) of the Act by invoking interest arbitration under a multiemployer contract after the employer had withdrawn from the association (NECA) that negotiated the contract. (The union had 9(a) status.) The Board began with the premise that "when parties have bargained for and reached

8

an agreement," including one with an interest arbitration clause, "fairness requires that they be allowed to enforce it." <u>Collier Electric</u>, 296 N.L.R.B. at 1098. Because interest arbitration is not a mandatory subject of bargaining, a dispute about the enforceability of an interest arbitration clause is "primarily contractual." <u>Id.</u> at 1099. Thus, the Board held, it is not "an unfair labor practice for a union to pursue adherence to [an interest arbitration] provision provided that the employer is arguably bound to it." <u>Id.</u> In that situation, the Board will stay its hand and defer to the courts because "it is the courts, not the Board, that are charged with determining the enforcement of provisions of contracts that do not involve mandatory subjects of bargaining." <u>Id.</u> (citing <u>Allied Chem. Workers of America Local Union No. 1 v. Pittsburgh Plate Glass Co.</u>, 404 U.S. 157, 184-88 (1971)).

The Board applied <u>Collier Electric</u> in <u>Sheet Metal Workers Local Union No. 20 (Baylor Heating)</u>, 301 N.L.R.B. 258, 1991 WL 16567 (1991). The employer in <u>Baylor Heating</u> had executed a section 8(f) collective bargaining agreement with the union, and the agreement contained provisions for interest arbitration. As the agreement neared its expiration, the employer refused to negotiate a successor agreement. And, the day after the old agreement expired, the employer withdrew its 8(f) recognition of the union. The union then invoked interest arbitration, the employer declined to participate, and the panel issued an award that directed the employer to execute a new contract with the union. The employer filed an unfair labor practice charge, alleging that the union had violated section 8(b)(1)(B) by invoking interest arbitration to bind the employer to a new agreement when the employer had lawfully repudiated its 8(f) relationship with the union. Relying on <u>Collier Electric</u>, the Board held that so long as the interest arbitration clause was "arguably binding" on the employer, the union did not commit an unfair labor practice by invoking interest arbitration, even though the agreement had expired and the employer had withdrawn from its 8(f) relationship with the union. <u>Baylor Heating</u>, 301 N.L.R.B. at 260-61. In other words, if the union can make a reasonable argument that the contract language allows it to submit "unresolved bargaining issues to interest arbitration," the union "will be free to invoke its contract rights, including pursuit of a court action to enforce the resulting agreement, without violating the Act." <u>Id.</u> at 260.

9

Several circuit cases have held that interest arbitration clauses survive the expiration of section 8(f) collective bargaining agreements, and the interest arbitration awards have been enforced in those cases. See Sheet Metal Workers Local 20 v. Baylor Heating and Air Conditioning, Inc., 877 F.2d 547, 556 (7th Cir. 1989) (enforcing interest arbitration award even though employer refused to negotiate and the collective bargaining agreement had expired), abrogated on other grounds by International Union of Operating Eng'rs, Local 150 v. Rabine, 161 F.3d 427, 430 (7th Cir. 1998); Sheet Metal Workers' Int'l Ass'n, Local 206 v. R.K. Burner Sheet Metal, Inc., 859 F.2d 758, 762 (9th Cir. 1988) (holding that "interest arbitration clauses survive the expiration of a collective bargaining agreement" and rejecting "the argument that contractual interest arbitration obligations are canceled by the absence of a statutory duty to bargain"); Sheet Metal Workers Local 57 Welfare Fund v. Tampa Sheet Metal Co., 786 F.2d 1459, 1460-61 (11th Cir. 1986) (holding that notwithstanding the expiration of the original labor contract, the employer was bound by a renewal contract issued by the arbitration panel according to the interest arbitration clause); see also Sheet Metal Workers Int'l Ass'n Local 110 Pension Trust Fund v. Dane Sheet Metal, Inc., 932 F.2d 578, 581-82 (6th Cir. 1991) (relying on circuit decisions in R.K. Burner, Baylor Heating, and Tampa Sheet Metal to enforce interest arbitration award after employer refused to negotiate and collective bargaining agreement expired).

The Board's Baylor Heating case and the Sheet Metal Workers cases from the circuits establish the principle-- at least when an 8(f) relationship between employer and union has ended-- that the absence of a statutory duty to bargain does not relieve a party from its contractual obligation to submit to interest arbitration. Stokes argues that these 8(f) cases do not apply because Local 666 became a 9(a) union on March 11, 1991, after a majority of its employees had signed union cards and Stokes recognized Local 666 as the exclusive bargaining agent for its employees. Stokes relies on the proposition that once it had a good-faith doubt of the Union's majority (9(a)) status, it had no statutory duty to bargain. Thereafter, according to Stokes, Local 666 could not seek to extend (or regain) its 9(a) representative status by invoking interest arbitration that would force the Company into new labor contracts on behalf of Stokes' employees. Thus, Stokes says, it must be relieved it of its contractual duty to sub-

mit to interest arbitration. As we will explain, Local 666 did not use interest arbitration as a ruse to hang on as a majority union.

There is no circuit case directly on point, but the Board's decision dismissing Stokes' unfair labor practice charge in this very case is instructive. See IBEW, Local Union No. 666 (Stokes Electrical), 326 N.L.R.B. 44, 1998 WL 568289 (1998). The Board held that the Union did not violate the Act when it invoked the interest arbitration clause and sued to enforce the resulting awards. (Neither party petitioned for review of the Board's order.) The Board rested its decision in Stokes Electrical on three factors. First, the Board found that, as in Collier Electric, the interest arbitration clause arguably bound Stokes to arbitration for a successor contract. See id. at *6. Second, the Board noted that the Union (when it invoked the interest arbitration clause) was not contending that Stokes "was obligated to recognize it as a 9(a) representative." Id. Thus, the Union was not trying "to use a contract secured through interest arbitration as a means of extending a 9(a) relationship." Id. Rather, it "was merely, like the respondent union in Baylor Heating, exercising a contractual right to employ interest arbitration for a successor contract." Id. Finally, the Board stressed that "in any event . . . there [was] no proof . . . that the Union had actually lost the majority status on which the original 9(a) recognition had rested." Id. The Board elaborated on this last point as follows:

> The Regional Director's administrative dismissal of [Stokes'] 8(a)(5) charge established only that he agreed with [Stokes'] contention that it had a good-faith doubt of the Union's majority status and that [Stokes] could thereafter decline to recognize and bargain with the Union without running afoul of Section 8(d) and Section 8(a)(5) of the Act. Even treating this administrative dismissal as a binding legal finding, however, we cannot properly equate it with a finding of actual loss of majority; that requires more than a finding that an employer has objective considerations for doubting a union's continuing majority support. While a conclusive determination of employee support for the Union might have been obtained through an election conducted pursuant to the RM petition filed by [Stokes] . . . that petition was dismissed by the Regional Director. Because neither party sought review of that dismissal, the propriety of

11

that action is not before us. We therefore need not decide whether a different result would be warranted in this case had there been proof of an actual loss of majority support for the Union prior to its invocation of the interest arbitration clause.

Id. (footnotes omitted). Once again, the Board deferred to the courts for a decision on whether the employer was bound by the interest arbitration provision.

The Board in Stokes Electrical focused in part on the Union's purpose in invoking the interest arbitration clause. We must also focus on the Union's purpose because Stokes' argument is built on its claim that the Union was illegally using interest arbitration to extend its 9(a) majority status. We repeat Stokes' argument: because it had no statutory duty to bargain (by reason of its established good-faith doubt about the Union's majority support), it was relieved of its contractual obligation to submit to interest arbitration, which was being used for an improper purpose.

The Board concluded in Stokes Electrical that Local 666 did not invoke interest arbitration for the purpose of extending its status as a 9(a) representative. We reach the same conclusion. The interest arbitration clause was in collective bargaining agreements that Stokes freely assented to before there was any question about the Union's status. When the Union invoked the interest arbitration clause, it was not seeking to extend its status as a majority representative under 9(a). Rather, it was demanding that Stokes comply with a provision in the old Agreements, a provision that bound Stokes to interest arbitration. Of course, Stokes had no statutory duty to bargain with the Union. But in this respect, Local 666 was like the unions in the Board's Baylor Heating case and the Sheet Metal Workers cases in the circuits. In those cases the unions had lost their 8(f) status, and the employers therefore had no statutory duty to bargain. The unions were nevertheless able to enforce interest arbitration clauses in expiring contracts. We also conclude that Local 666's situation did not bar it from invoking interest arbitration. Specifically, we hold that although Stokes had no statutory duty to bargain because of its good faith doubt about the Union's majority, it was not for that reason relieved of its contractual obligation to submit to interest arbitration.

12

## C.

Stokes next argues that the Regional Director's dismissal of its election petition was tantamount to a formal decertification by election, an event that would have ended the Union's rights under the collective bargaining agreement. See, e.g., Retail Clerks Int'l Ass'n v. Montgomery Ward & Co., 316 F.2d 754, 757 (7th Cir. 1963) (holding that unions were not entitled to specific performance of collective bargaining agreements after employees voted in Board-supervised elections to decertify the unions). According to the Regional Director, he dismissed the election petition as moot simply because he had previously concluded that Stokes' refusal to bargain was based on a good-faith doubt about the Union's majority status. Yet Stokes appears to be saying that we must treat the Regional Director's dismissal as an unassailable forecast that the Company would have won a formal, Board-supervised election. But forecasts about who will win an election are often wrong. In any event, the Regional Director did not venture beyond what had been established: Stokes' good-faith doubt of the Union's majority. Good-faith doubt is not the same as the certainty of a formal vote. See Stokes Electrical, 1998 WL 568289, at *6. Thus, the Regional Director's dismissal of the election petition was not equivalent to decertification by election.**3**

## D.

Finally, Stokes argues that enforcing the interest arbitration awards would violate a fundamental policy underlying the NLRA, that is, the policy of promoting the ability of workers to designate "representatives of their own choosing." 29 U.S.C. § 151. Stokes' argument overlooks another fundamental policy expressed in the NLRA, that of "encouraging the practice and procedure of collective bargaining." Id. One of the best ways to encourage collective bargaining is to allow for the enforcement of contracts arrived at through collective bargaining. As the Board said in Collier Electric: "our premise is that collective bargaining should be fostered and that when parties have bargained for and reached an agreement, fairness requires that they be allowed to enforce it." Collier Electric, 296 N.L.R.B. at 1098. The

_____

**3** We offer no opinion on what the result would have been in this case if the Union had been decertified through an election.

interest arbitration clause in this case was agreed upon through collective bargaining at a time when the Union's majority status was not in doubt. We believe that enforcing the clause as a matter of contract promotes the NLRA's policy of encouraging the practice of collective bargaining.

We are not unmindful of the section 7, 29 U.S.C. § 157, right of Stokes' employees to choose their own representative. But here it was Stokes, and not the employees, who filed the election petition. The employees, of course, were always free to assert their section 7 right by filing their own election petition under section 9(c). In the circumstances of this case, the policy of employee free choice does not override the policy of encouraging voluntary agreements through collective bargaining. To put it more directly, we see nothing in the policies behind the NLRA that keeps us from saying that Stokes must abide by its agreements to submit to interest arbitration.

III.

We hold that Stokes is bound by the interest arbitration clause and that the CIR's awards directing the Company to sign and implement the new 1994-96 Agreements must be enforced. By holding that the CIR's interest arbitration awards are enforceable, we are not condemning Stokes to a perpetual cycle of interest arbitration for new labor agreements. As a contractual matter, the new 1994-96 Agreements do not allow unilateral submission of issues to interest arbitration. By their terms the new Agreements require both parties to agree to interest arbitration: "By mutual agreement only, the parties may jointly submit the unresolved issues to the Council on Industrial Relations for the Electrical Contracting Industry for adjudication." In any event, as a matter of law the new Agreements could not have provided for unilateral interest arbitration. Because an "interest arbitration clause is a non-mandatory subject of bargaining," parties may be bound to such a clause in a future contract only by mutual consent. Sheet Metal Workers Int'l Ass'n Local Union No. 420 v. Huggins Sheet Metal, 752 F.2d 1473, 1475 (9th Cir. 1985).

We reverse the district court's entry of summary judgment in favor of Stokes. We remand (1) for the entry of summary judgment in favor of Local 666 (to the effect that Stokes was bound by the interest arbi-

14

tration clause), (2) for the enforcement of the CIR's awards directing Stokes to sign and implement the 1994-96 Agreements, and (3) for any further proceedings that are appropriate.

REVERSED AND REMANDED

15