In the

# United States Court of Appeals
## For the Seventh Circuit

No. 04-4217

CENTRAL STATES, SOUTHEAST AND SOUTHWEST
AREAS PENSION FUND and HOWARD MCDOUGAL,

*Plaintiffs-Appellants,*

*v.*

SCHILLI CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 8880—**John W. Darrah**, *Judge.*

ARGUED JUNE 2, 2005—DECIDED AUGUST 23, 2005[1]

Before FLAUM, *Chief Judge*, and BAUER and EVANS, *Circuit Judges.*

FLAUM, *Chief Judge.* The Multiemployer Pension Plan Amendments Act ("MPPAA"), Pub. L. 96-364, 94 Stat. 1208 (Sept. 26, 1980), imposes liability on employers who

---

[1] This opinion has been circulated among all judges of this circuit in regular active service pursuant to Circuit Rule 40(e). No judge favored a rehearing en banc on the question of whether decertification provides a defense per se to liability in an action brought under 29 U.S.C. § 1145.

withdraw from multiemployer plans governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461. Central States, Southeast and Southwest Areas Pension Fund ("Central States") is a multiemployer plan governed by ERISA. Schilli Corporation is an employer who participated in the plan until the late 1990s. Central States assessed Schilli liability for allegedly withdrawing from the plan in part in 1997. Schilli paid Central States the assessment under protest, and the parties later submitted their dispute to arbitration. The arbitrator concluded that Schilli had not withdrawn from the plan in 1997 and ordered Central States to refund the assessment. Central States then filed this action under 29 U.S.C. § 1401(b)(2) to vacate the arbitrator's award. On cross-motions for summary judgment, the district court affirmed the arbitrator's award. Central States appeals and, for the reasons stated herein, we affirm.

## I. Background

Schilli is the parent corporation of three wholly-owned subsidiaries. One of those subsidiaries, Truck Transport, is a motor carrier providing regulated, for-hire transportation services. In 1997, it operated out of a terminal in Batesville, Arkansas, where its employees were represented by the International Brotherhood of Teamsters Local Union No. 878 ("Local 878"). Truck Transport and Local 878 had negotiated a series of consecutive collective bargaining agreements ("CBAs") that obligated Truck Transport to contribute specified amounts to Central States' pension fund on behalf of all employees in the Batesville bargaining unit. The most recent of those CBAs extended from July 10, 1994 through January 10, 1998.

In addition to the CBAs, on May 31, 1987, Truck Transport and Local 878 signed a separate document entitled "Participation Agreement." The Participation Agreement

obligates Truck Transport to contribute to Central States a set amount per week "for its bargaining unit Employees pursuant to the terms of the collective bargaining agreement." The parties to the document "agree to be bound by . . . all of the terms of the Trust Agreement(s) creating" Central States. It provides, moreover:

> This Agreement shall continue in full force and effect until such time as the Employer notifies the Fund(s) by certified mail (with a copy to the Local Union) that the Employer is no longer under a legal duty to make contributions to the Fund(s). The Employer shall set forth in the required written notice to the Fund(s) the specific basis upon which the Employer is relying in terminating his obligation to make contributions to the Fund(s). The Employer expressly agrees and hereby acknowledges by the signing of this Agreement that its obligation to make contributions to the Fund(s) shall continue until the above-mentioned written notice is received by the Fund(s) and the Trustees acknowledge the Employer's termination in writing.

Central States bills participating employers on a monthly basis for their contributions to the pension fund. It requires that employers sign a form with the following language when they submit their monthly contributions:

> The employer hereby reaffirms his obligation to make contributions required by the Collective Bargaining Agreement and further represents that all employees eligible to participate in the Fund, in accordance with the rules of the Fund and the "Employee Retirement Income Security Act of 1974", are being reported and only those eligible employees are being reported.

Truck Transport signed and submitted these monthly certification clauses along with each payment it made to Central States.

In November 1997, employees at the Batesville terminal filed a petition with the National Labor Relations Board ("NLRB") under 29 U.S.C. § 159(c)(1)(A)(ii), asserting that Local 878 no longer represented a majority of the workers in the Batesville bargaining unit. The NLRB then held an election, and a majority of the employees voted to decertify the union as their representative. On November 21, 1997, the NLRB confirmed the election results and announced that Local 878 no longer served as the exclusive bargaining representative of the Batesville employees.

Following the election, Truck Transport conducted business as usual. Many of its employees kept their same jobs fulfilling their same duties. In December 1997 and January 1998, Truck Transport submitted its monthly contributions accompanied by signed certification clauses on behalf of its employees. At no time during 1997 did Truck Transport notify Central States of the decertification or contend that it had been relieved of its duty to contribute to the fund.

In January 1998, Truck Transport lost its largest customer to a competitor. The substantial drop in business forced Truck Transport to close the Batesville terminal on January 10, 1998. It ceased contributing to Central States on that date. Although Central States was aware of the terminal's closing soon thereafter, it did not learn of Local 878's decertification until March 1998.

The MPPAA requires that, upon an employer's withdrawal from a multiemployer plan, the plan determine the amount of withdrawal liability due under a statutory formula, notify the employer of the amount of liability, and collect that amount from the employer. 29 U.S.C. § 1382. After some initial confusion about the timing of the events in question, Central States judged that Truck Transport had withdrawn from the fund in 1997. It deter-

mined that Schilli's other two subsidiaries, which also had been contributing to the fund, withdrew in 1998. Because all businesses under common control are treated as a single entity when assessing withdrawal liability, *see* § 1301(b)(1), Central States concluded that Schilli had partially withdrawn in 1997 and completely withdrawn in 1998. It demanded payment accordingly. § 1399(b)(1)(B).

Although Schilli contested Central States' assessment, it paid the demanded sum. *See* § 1399(c)(2) (requiring prompt payment to the plan "notwithstanding any request for review or appeal"). After the parties failed to resolve their disagreement informally, they submitted the dispute to arbitration as required by the Act. *See* § 1401(a). In determining the timing of Truck Transport's withdrawal, the arbitrator noted that, for present purposes, an employer withdraws from a plan only when it ceases to have an obligation to contribute. The arbitrator found that the Participation Agreement bound Truck Transport to contribute to the fund until it complied with the agreement's notice provision, and that Truck Transport had not given the prescribed notice in 1997. Thus, it held that Truck Transport had not withdrawn in 1997 and that Schilli could not be assessed partial withdrawal liability for that year. Accordingly, the arbitrator ordered Central States to refund Schilli the amount it had paid for allegedly withdrawing in 1997.

Central States then filed this action in the Northern District of Illinois to vacate the arbitrator's award. *See* § 1401(b)(2). On cross-motions for summary judgment, the district court held that Schilli had not partially withdrawn in 1997 and affirmed the arbitrator's award. Central States appeals.

## II.  Discussion

Because this case turns on a question of law, the district court properly reviewed the arbitrator's conclusions de novo. *See Central States, S.E. & S.W. Areas Pension Fund v. Midwest Motor Express, Inc.*, 181 F.3d 799, 805 (7th Cir. 1999). We, in turn, review de novo the district court's grant of summary judgment. *Id.* at 804. Summary judgment is appropriate only if our resolution of the legal issue shows that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *O'Kane v. Apfel*, 224 F.3d 686, 688 (7th Cir. 2000).

Multiemployer plans are defined-benefit plans, meaning that they must pay beneficiaries a set level of benefits "even if the contributions they expected to receive do not materialize." *Central States, S.E. & S.W. Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1151 (7th Cir. 1989) (en banc). Accordingly, when an employer withdraws from a multiemployer plan and stops contributing, there is a risk that the burden of funding its employees' benefits will be shifted to the other employers in the plan or to the Pension Benefit Guaranty Corporation, which ensures these benefits. *Central States, S.E. & S.W. Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1371 (7th Cir. 1992). The MPPAA guards against this risk by imposing withdrawal liability on employers who pull out of multiemployer plans. 29 U.S.C. § 1381(a). The statute sets this liability at an amount equal to a proportionate share of the withdrawing employer's unfunded vested benefits. *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 217 (1986). Liability is imposed both for partial and complete withdrawals from a plan. 29 U.S.C. § 1381(a).

The parties agree that in 1998, two of Schilli's subsidiaries that previously had been contributing to Central States withdrew from the plan. The principal issue in this appeal is whether its third subsidiary, Truck Transport, withdrew

in 1997 or 1998. If Truck Transport withdrew in 1998, then Schilli may be assessed withdrawal liability for that year only, when all of its subsidiaries withdrew. If, however, Truck Transport withdrew in 1997, Schilli may be assessed liability for a partial withdrawal in 1997 in addition to its complete withdrawal in 1998. *See* § 1301(b)(1) (treating all businesses under common control as a single entity).

Subject to exceptions not relevant here, an employer partially withdraws in a given year "if for such plan year . . . there is a partial cessation of the employer's contribution obligation." 29 U.S.C. § 1385(a)(2).

> There is a partial cessation of the employer's contribu-tion obligation for the plan year if, during such year . . . the employer permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan but continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required . . . .

§ 1385(b)(2)(A)(i). Thus, to assess Schilli for a partial withdrawal in 1997, Central States must show that Truck Transport: (i) ceased having an obligation to contribute to the fund in 1997; and (ii) continued to perform work at the Batesville terminal after its contribution obliga-tion ended. Schilli admits that Truck Transport "continue[d] to perform work in the jurisdiction of the collective bargain-ing agreement" through 1998. The only dispute, therefore, is whether Truck Transport's obligation to contribute ceased in 1997.

Central States contends that the decertification of the union in 1997 automatically extinguished Truck Transport's obligation to contribute. Schilli agrees that decertification terminated Truck Transport's obligations under the 1994 CBA. It argues, however, that Truck Transport remained

bound to contribute to the fund under the Participation Agreement until it complied with that document's notice provision. Because it did not give the prescribed notice in 1997, Schilli asserts that Truck Transport remained obligated to contribute until 1998.[2]

Central States rejoins that even if the decertification did not void the Participation Agreement by operation of law, the terms of that document condition Truck Transport's obligation to contribute upon Local 878's status as the exclusive bargaining representative of the Batesville employees. Central States also argues that it waived its contractual right to receive the prescribed notice, thereby releasing Truck Transport from its obligations and triggering a partial withdrawal in 1997. Finally, it asserts that the implied duty of good faith and fair dealing precludes Truck Transport from relying on its failure to give notice to avoid withdrawal liability. We address these arguments in turn.

## A. Decertification

Central States argues that the decertification of Local 878 terminated Truck Transport's obligation to contribute under both the 1994 CBA and the Participation Agreement by operation of law. Because the NLRB confirmed the results of the election on November 21, 1997, Central States contends that Truck Transport withdrew from the plan that year. Schilli suggests, without stating explicitly, that Central States is judicially estopped from making this

---

[2] Schilli also contends that Truck Transport remained obligated to contribute until 1998 by virtue of the monthly certification clauses it signed in December 1997 and January 1998. Because we conclude that Truck Transport remained bound by the Participation Agreement, we do not reach the effect of the certification clauses.

argument because it took the opposite position in a prior case. Schilli's brief neither uses the term "judicial estoppel" nor cites any authority on that doctrine. "[A] litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority, forfeits the point." *Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 569 (7th Cir. 2004) (quoting *Tyler v. Runyon*, 70 F.3d 458, 464 (7th Cir. 1995)). Accordingly, Schilli has forfeited any claim of judicial estoppel.

Turning to the merits, Schilli contends that although the decertification voided the 1994 CBA, the terms of the Participation Agreement make clear that Truck Transport's obligations survive that event. Schilli highlights the language of the notice clause, which provides that the agreement "shall continue in full force and effect until such time as" Truck Transport notifies Central States that it "is no longer under a legal duty to make contributions to the Fund(s)." That clause emphasizes that Truck Transport's "obligation to make contributions to the Fund(s) shall continue until the above-mentioned written notice is received" and acknowledged by Central States. Because Truck Transport did not give this notice in 1997, Schilli argues that its subsidiary remained obligated to contribute until 1998 despite the decertification of the union.

We analyze Truck Transport's obligation to contribute by considering who might enforce the Participation Agreement. At the outset, we conclude that decertification terminated the union's right to enforce the agreement. Local 878 negotiated the Participation Agreement on behalf of all of the members of the Batesville collective bargaining unit—whether members of the union or not. The union enjoyed the authority to act as the exclusive representative of the bargaining unit, speaking for its supporters and detractors alike, only because federal law vested it with that power. *See* 29 U.S.C. § 159(a); *Brooks v. NLRB*, 348 U.S. 96, 103 (1954). But federal law's grant of

that authority is conditioned upon Local 878 being "designated or selected . . . by the majority of the employees in [the bargaining] unit." 29 U.S.C. § 159(a). The employees' vote to decertify the union and the NLRB's confirmation of that election established conclusively that Local 878 no longer enjoyed the support of a majority of the employees in the unit. *See* 29 U.S.C. § 159(a), (c). Accordingly, Local 878's authority to represent all bargaining unit employees and to enforce any contractual rights it had negotiated on behalf of those employees as a class dissolved at that point. *See Pioneer Natural Res. USA, Inc. v. Paper, Allied Indus., Chem. & Energy Workers Int'l Union Local 4-487*, 338 F.3d 440, 441-42 (5th Cir. 2003); *Local Union No. 666, Int'l. Bhd. of Elec. Workers v. Stokes Elec. Serv., Inc.*, 225 F.3d 415, 424 (4th Cir. 2000); *Sheet Metal Workers' Int'l Ass'n, Local 206 v. W. Coast Sheet Metal Co.*, 954 F.2d 1506, 1509 (9th Cir. 1992); N. Peter Lareau, Labor & Employment Law § 12.04[3][b][ii] (2003). *Cf. Retail Clerks Int'l Ass'n AFL-CIO v. Montgomery Ward & Co.*, 316 F.2d 754, 757 (7th Cir. 1963). Because Local 878 negotiated the Participation Agreement in its capacity as the exclusive bargaining representative of all employees in the Batesville unit, its right to enforce that agreement ended at decertification.

This is true despite Truck Transport's failure to comply with the notice clause of the Participation Agreement. Decertification terminates a union's rights by operation of law without regard to the language of the contract. Just as decertification nullified the 1994 CBA before it would have expired by its terms, the Participation Agreement dissolved despite language purporting to continue it "in full force and effect" until the described notice was given.

The union is not the only party with standing to enforce that agreement, however. The MPPAA authorizes multiemployer plans to sue for delinquent contributions owed "under the terms of the plan or under the terms of a collectively bargained agreement." 29 U.S.C. § 1145;

*see also* § 1132(d)(1). Moreover, § 1145 gives a multi-employer plan greater rights under these documents than the union itself, entitling a plan "to enforce the writing without regard to understandings or defenses applicable to the original parties." *Central States, S.E. & S.W. Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1149 (7th Cir. 1989) (en banc). Thus, many of the defenses that Truck Transport might raise in an action brought by Local 878 would not be viable in an action brought by Central States.

Schilli argues that if Truck Transport would have been liable in a § 1145 action for contributions through 1998, it remained "obligated to contribute" for withdrawal liability purposes until then. We assume without deciding that this is true.[3] On this assumption, the question becomes whether decertification is a defense in a § 1145 action. If so, Central States could not have prevailed against Truck Transport for contributions after the union's decertification, and Truck Transport ceased having an "obligation to contribute" for withdrawal liability purposes at that point.

Central States urges us to recognize decertification as a defense to § 1145 liability. We conclude, however, that our precedents foreclose this course. In *Gerber Truck*, we ruled that "the lack of majority support for the union and the consequent ineffectiveness of [a contract] under labor law" is not a valid defense in a § 1145 action. 870 F.2d at 1153 (en banc). We took a similarly narrow view of the available

---

[3] Section 1392(a) of Title 29 provides that, for purposes of withdrawal liability, an employer's "'obligation to contribute' . . . does not include an obligation . . . to pay delinquent contributions." Neither party addresses whether this language might mean that an employer does not have an "obligation to contribute" for withdrawal liability purposes merely because it faces exposure in a § 1145 action. We leave for another day the effect of this provision.

defenses in *Moriarty v. Svec*, 164 F.3d 323 (7th Cir. 1998). In that case, a pension fund sued an employer under § 1145 for delinquent contributions due under a CBA between the employer and a local union. While the case was pending in the district court, the NLRB ruled that some of the defendant's employees were not members of the collective bargaining unit represented by the union that had negotiated the CBA. The defendant argued that because the union did not represent the employees in question, "it could not collectively bargain on their behalf, and consequently, the CBAs [were] invalid with respect to" those employees. *Id*. at 335. Citing *Gerber Truck*, we rejected this argument. *Moriarty*, 164 F.3d at 335 ("nothing in ERISA makes the obligation to contribute depend on the existence of a valid collective bargaining agreement") (internal quotation and citation omitted).

Moreover, in *Martin v. Garman Construction Co.*, 945 F.2d 1000 (7th Cir. 1991), the employer had signed a "prehire agreement" under § 8(f) of the National Labor Relations Act, 29 U.S.C. § 158(f), which obligated it to contribute to pension and trust funds on behalf of its employees. Throughout the term of the agreement, the employer, Garman, employed only one person in the relevant bargaining unit. Garman sought to repudiate the agreement and end its contributions long before the agreement would have expired by its terms. The union filed an unfair labor practice charge with the NLRB and the funds sued for delinquent contributions under § 1145.

Relying on the "one-person unit rule," the NLRB found that Garman had not committed an unfair labor practice. This rule provides that where an employer employs one or fewer employees on a permanent basis in the relevant bargaining unit, the employer may, without violating § 8(a)(5) of the NLRA, "withdraw recognition from a union, repudiate its contract with the union, or unilaterally change employees' terms and conditions of employment

without affording a union an opportunity to bargain." *J.W. Peters, Inc. v. Bridge, Structural & Reinforcing Iron Workers, Local Union 1*, 398 F.3d 967, 973 (7th Cir. 2005) (quoting *Stack Electric, Inc.*, 290 N.L.R.B. 575, 577 (1988)). The rule is based on the principle that "collective bargaining presupposes that there is more than one eligible person who desires to bargain." *Id.* at 973-74 (quoting *Foreign Car Ctr., Inc.*, 129 N.L.R.B. 319, 320 (1960)). Without others to represent, collective bargaining is meaningless.

Garman then moved for summary judgment in the ERISA proceeding, contending among other things that the NLRB's order was res judicata and collaterally estopped it from being held liable under § 1145. We held that the NLRB's order did not have preclusive effect. *Martin*, 945 F.2d at 1003-06. Relying on *Gerber Truck*, moreover, we went on to reject the one-person unit rule as a defense to § 1145 liability. *Id.* at 1004 ("The district court properly refused to permit the one-man rule to impair the contract's validity under 29 U.S.C. § 1145.").

Neither *Gerber Truck*, *Moriarty*, nor *Martin* squarely addressed the decertification of a union. Nevertheless, these cases reveal that a union's lack of majority support or authority to collectively bargain, standing alone, will not preclude liability under § 1145. As explained above, a union loses its rights upon decertification because it no longer enjoys majority support or the authority to represent the bargaining unit. Because the decertification defense rests on these rationales, we hold that it does not serve as a categorical bar to § 1145 liability.[4]

---

[4] Our opinion in *Midwest Motor Express* does not compel the opposite conclusion. 181 F.3d 799. There, we mentioned in passing that the decertification of a union had ended the employer's obligation to contribute to a pension fund. *Id.* at 803. The effect of
(continued...)

We note that several of our sister circuits have suggested or held that decertification is a defense in § 1145 actions. *See La. Bricklayers & Trowel Trades Pension Fund & Welfare Fund v. Alfred Miller Gen. Masonry Contracting Co.*, 157 F.3d 404, 408 (5th Cir. 1998) (dicta); *Agathos v. Starlite Motel*, 977 F.2d 1500, 1505 (3d Cir. 1992) (dicta); *W. Coast Sheet Metal Co.*, 954 F.2d at 1509-10 (holding). These cases give only a cursory explanation of the rationales underpinning the decertification defense. As explained, we have previously rejected those rationales as bases for defenses against § 1145 liability. Moreover, recognizing decertification as a defense per se would not accord with § 1145's language, which authorizes plans to sue for contributions due "under the terms of the plan or under the terms of a collectively bargained agreement." We therefore decline to adopt the position of our sister circuits.

That is not to say, however, that decertification is irrelevant in this context. Both the text of § 1145 and *Gerber Truck* make clear that an employer is not bound by a contract that is unlawful. *See* 29 U.S.C. § 1145 (requiring that employers contribute according to the terms of plans only "to the extent not inconsistent with law"); *Gerber Truck*, 870 F.2d at 1153 ("If the contract provides for the commission of unlawful acts, it will not be enforced."). If it would have been unlawful for Truck Transport to continue to make contributions under the Participation Agreement following the union's decertification, it would have a valid defense. Central States does not develop an argument on this point, however. It makes the related assertion that an employer commits an unfair labor practice by bargaining

---

[4] (...continued)

decertification, however, was not contested in that appeal. Nor did either party address the interplay between § 1145 and withdrawal liability, a consideration central to our holding. Thus, *Midwest Motor Express* does not bind us here.

with a union after it has been decertified. But it fails to argue or cite authority for the proposition that continuing to make contributions is equivalent to bargaining with a minority union. Because Central States has forfeited this argument, *see Northeastern Ill. Univ.*, 388 F.3d at 569, we cannot conclude that decertification affords a defense to § 1145 liability under the facts of this case. Accordingly, the decertification of Local 878 did not terminate Truck Transport's obligation to contribute, for withdrawal liability purposes, by operation of law.

## B. Terms of the Participation Agreement

Central States argues in the alternative that even if decertification does not give rise to a defense by operation of law, the terms of the Participation Agreement themselves condition Truck Transport's duty to contribute upon Local 878's status as the exclusive bargaining representative of the Batesville employees. It contends, therefore, that Truck Transport's obligations terminated once Local 878 lost that status. As support for this argument, Central States relies on the following language: "the Union and the Employer have entered into a collective bargaining agreement which provides for participation in [Central States' pension fund] in order to obtain . . . benefits for employees . . . represented by the Union and employed by the Employer." Central States reads this to mean that the agreement is effective only as long as the employees are "represented by the Union," i.e., Local 878.

Central States' reading cannot be squared with the notice clause of the Participation Agreement. That clause explicitly provides that Truck Transport's contribution duties will continue until it gives the prescribed notice. While decertification terminated Local 878's right to enforce the agreement notwithstanding this language, liability in a § 1145 action turns on "the terms of the plan or the terms of the

collectively bargained agreement." Because Central States' interpretation contradicts those terms, we reject this argument.

## C.  Waiver

As a fallback position, Central States contends that it waived the notice requirements of the Participation Agreement in 1997, thereby relieving Truck Transport of its obligation to contribute and triggering withdrawal liability for that year. As evidence of its claim of waiver, Central States points out that it has never demanded that Truck Transport comply with the notice provision. In general, a party may waive its contractual rights impliedly by taking "actions inconsistent with the assertion of those rights." *Bank v. Truck Ins. Exch.*, 51 F.3d 736, 739 (7th Cir. 1995). We cannot agree, however, that Central States' actions in 1997 were inconsistent with its right to receive notice as required by the agreement. Central States did not learn of the union's decertification until March 1998. Accordingly, it would have had no occasion to demand compliance with the notice provision in late 1997. We can draw no inferences from its silence during that span. To the extent that Central States' later behavior waived its rights, that waiver did not release Truck Transport from its obligations until 1998. We therefore reject this argument.

## D.  Duty of Good Faith and Fair Dealing

Finally, Central States argues that the duty of good faith and fair dealing obligates a party to take reasonable efforts to bring about conditions precedent within its control. It characterizes the notice provision as a condition precedent to withdrawal liability, and asserts that, because Truck Transport controlled whether to give notice, it was required to do so immediately upon decertification. Central States

argues that because Truck Transport breached this duty, it cannot rely on the lack of notice to avoid withdrawal liability.

This argument does not withstand scrutiny. Central States' position implies that the duty of good faith obligates employers to take actions necessary to ensure that they are subject to withdrawal liability. An employer incurs withdrawal liability only when it withdraws partially or completely from a multiemployer plan. 29 U.S.C. § 1381(a). Congress imposed withdrawal liability, however, to give employers an incentive not to withdraw from multiemployer plans. *Midwest Motor Express, Inc.*, 181 F.3d at 806; *see also* 29 U.S.C. § 1001a(c). Whatever the duty of good faith may require in this context, it cannot obligate employers to take the very action that Congress enacted the MPPAA to prevent.

### III. Conclusion

For the reasons stated herein, we hold that Truck Transport remained obligated to contribute to Central States' plan until it complied with the notice provision of the Participation Agreement. Because Truck Transport did not give Central States the prescribed notice in 1997, its parent—Schilli—did not partially withdraw from the plan that year. Accordingly, we AFFIRM the judgment of the district court.

A true Copy:

      Teste:

 

*Clerk of the United States Court of Appeals for the Seventh Circuit*