61 F.3d 911
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 357,
AFL-CIO, Plaintiff-Appellant
v.
GREYHOUND EXPOSITION SERVICES, INC., Defendant-Appellee.
 No. 94-16814.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted June 14, 1995.
Decided July 20, 1995.
 
 Before: HUG, ALARCON, and TROTT, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Plaintiff-Appellant International Brotherhood of Electrical Workers, Local 357, AFL-CIO, ("Union") appeals from the district court's order granting summary judgment in favor of Greyhound Exposition Services, Inc. ("GES"). The district court stated that a prerequisite to its jurisdiction in an action brought pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185 (1988) is the existence of a collective bargaining agreement. The district court concluded that GES was not bound to the 1990-1993 collective bargaining agreement upon which the Union based jurisdiction in its complaint. Accordingly, the court granted GES's motion for summary judgment on the basis that it lacked subject matter jurisdiction to consider the Union's allegations.
 
 
 3
 The Union contends that the district court erred in finding that it lacked subject matter jurisdiction because GES was bound to the 1990-1993 collective bargaining agreement. The Union also argues that the district court erred in failing to confirm the three arbitration awards rendered by the Labor-Management Committee in favor of the Union and against GES. We affirm because GES was not bound to the 1990-1993 collective bargaining agreement at the time of the alleged breaches. We also conclude that the district court properly declined to rule on the enforcement of the arbitration awards once it determined it lacked subject matter jurisdiction.
 
 
 4
 * GES installs and removes booths for trade shows at the Las Vegas Convention Center and other locations. GES maintains a regular core of employees on its payroll and hires all other "temp" or "casual" employees on a show-by-show basis. The Union began dispatching workers to GES in 1973.
 
 
 5
 Following negotiations initiated by the Union, GES and the Union entered into a letter of assent drafted by the Union on May 25, 1984 ("1984 letter of assent"). By executing the 1984 letter of assent, GES agreed to be bound to the "current approved" Inside Labor Agreement ("ILA"), and "all approved amendments thereto" negotiated between the Union and the regional employer's association, National Electrical Contractors Association ("NECA"). The 1984 letter of assent provided, in pertinent part, as follows:
 
 
 6
 This is to certify that the undersigned employer has examined a copy of the current approved Inside [L]abor [A]greement between Southern Nevada Chapter, National Electrical Contractors Assoc. and Local Union 357, IBEW.
 
 
 7
 The undersigned employer hereby agrees to comply with all the terms and conditions of employment contained in the above mentioned agreement and all approved amendments thereto. It is understood that the signing of this letter of assent shall be as binding on the undersigned employer as though he had signed the above referred to agreement, including any approved amendments thereto.
 
 
 8
 This letter of assent shall become effective for the undersigned employer on the 25th day of May, 1984 and shall remain in effect until the 31st day of May, 1985 (termination date).
 
 
 9
 If the undersigned employer does NOT intend to renew this assent, he shall so notify the Local Union in writing at least sixty (60) days prior to the termination date.
 
 
 10
 The 1984 letter of assent replaced a former letter of assent ("1973 letter of assent") executed by GES's predecessor, Las Vegas Convention Services Co., and the Union.[1]
 
 
 11
 At the time GES executed the 1984 letter of assent, the "current approved" ILA was an agreement that took effect June 1, 1981 and was to remain in effect until May 31, 1984. NECA and the Union agreed to extend the ILA until May 31, 1985.[2] The 1981-1985 ILA between NECA and the Union provided that it would remain in effect unless "changed or terminated" by either party. GES abided by the terms of the 1981-1985 ILA.
 
 
 12
 By letter dated January 24, 1985, the Union notified NECA it was "opening the Agreement" for negotiation. The negotiation process produced a 1985-1987 ILA. On February 19, 1987, the Union again notified NECA of its "desire to open for discussion the articles, sections and clauses of [the Inside Wireman's] Agreement" for negotiation. Subsequently, the parties consented to a 1987-1990 ILA. On January 31, 1990, the Union once again notified NECA that it was "opening the Agreement for the Inside Wiremen [sic]." The Union and NECA then negotiated the 1990-1993 ILA.
 
 
 13
 In a letter dated February 28, 1991, GES gave notice to the Union that it desired to "change (or terminate) our Agreement with [the Union]." The chief executive officer of the Union alleged in his affidavit that "the Inside Agreement then in effect was not due to expire until May 31, 1993, and after consultation with counsel, the Union concluded it had no obligation to engage in negotiations with GES and did not do so at that time."
 
 
 14
 On April 5, 1992, GES concluded a show for the International Racquet Sports Association. After the show, GES laid off four electricians represented by the Union. One of the employees was a Union shop steward. The Union filed grievances alleging violation of, inter alia, sections 2.12, 3.07 and 3.09 of the 1990-1993 ILA.[3] The Union requested the payment provided for in the agreement for violation of these sections. On May 12, 1992, GES wrote to the Union and NECA, notifying both parties that GES decided to "terminate the Labor Agreement [with the Union] effective June 1, 1992."
 
 
 15
 The Union's grievances regarding the four layoffs were not resolved with GES. The Union referred the dispute to the Labor-Management Committee ("Committee") as provided for in the 1990-1993 ILA. The Committee consisted of three members representing the Union and three members representing the employer. Both the Union and GES participated in the hearing conducted by the Committee. The Committee concluded that GES was in violation of sections 3.07 and 3.09 of the ILA and ordered payment. The Committee deadlocked concerning the section 2.12 violation. The section 2.12 violation issue was referred to the Interim Committee of the Council on Industrial Relations for the Electrical Contracting Industry ("CIR") in compliance with the 1990-1993 ILA. The CIR resolved the grievance in favor of the Union. As a result, GES was ordered to pay the appropriate wages and reinstate the shop steward. GES did not comply with any of the arbitration awards.
 
 
 16
 On June 19, 1992, the Union filed a complaint for breach of collective bargaining agreement alleging that GES abrogated the 1990-1993 ILA prior to May 31, 1993, and failed to implement a wage increase due June 1, 1992. The Union further alleged that the grievances were properly processed and that GES failed to comply with the Committee's awards. The Union moved for summary judgment. GES opposed the motion for summary judgment and filed a cross-motion for summary judgment.
 
 
 17
 On July 29, 1993, the district court granted GES's cross-motion for summary judgment. The district court found that, by the express terms of the 1984 letter of assent, GES agreed to be bound only by the 1981-1985 ILA and approved amendments thereto. The Union's complaint stated the court had jurisdiction under 29 U.S.C. Sec. 185[4] because GES violated various provisions of the 1990-1993 ILA. The court concluded that it lacked subject matter jurisdiction because the record shows that the Union was not bound by the 1990-1993 ILA. Judgment was entered in favor of GES and against the Union on November 4, 1993.
 
 II
 
 18
 The narrow question presented to us is whether the district court erred in granting summary judgment in favor of GES on the basis that it lacked subject matter jurisdiction over the Union's complaint. We review a grant of summary judgment de novo, without deference to the ruling of the district court. United States v. Presidio Invs., Ltd., 4 F.3d 805, 808 (9th Cir. 1993).
 
 
 19
 The Union contends that the district court erred in concluding that it lacked subject matter jurisdiction because it misconstrued the 1984 letter of assent. Specifically, the Union argues that the 1984 letter of assent unambiguously provides that failure to express an intent not to renew indicates an intent to renew. Because GES failed to notify the Union at least sixty days prior to the termination date that it did not intend to renew, the Union maintains that the 1984 letter of assent automatically renewed and bound GES to all subsequent ILAs, including the 1990-1993 ILA. GES contends, conversely, that the 1984 letter of assent unambiguously provides that its agreement to be bound by the 1981-1985 ILA and "approved amendments thereto" would terminate on May 31, 1985.
 
 
 20
 A contract is ambiguous when its language is reasonably susceptible to more than one interpretation. O'Neill v. United States, 50 F.3d 677, 683 (9th Cir. 1995); Castaneda v. Dura-Vent Corp., 648 F.2d 612, 619 (9th Cir. 1981). In this case, the 1984 letter of assent contains an explicit termination date of May 31, 1985, as well as a clause requiring notice of termination at least sixty days prior to May 31, 1985.
 
 
 21
 It is undisputed that GES failed to notify the Union at least sixty days prior to May 31, 1985 of its intent not to renew the 1984 letter of assent. This omission, however, did not automatically bind GES to the subsequent ILAs until GES gave express and timely notice of its intention not to renew the 1984 letter of assent. Unlike the automatic termination clauses at issue in the cases relied upon by the Union, the clause requiring notice of termination in the 1984 letter of assent does not affirmatively and explicitly state that, absent notice, the agreement would continue in effect for a specified term. Compare Operating Eng'rs Pension Trust v. Cecil Backhoe Serv., Inc., 795 F.2d 1501, 1505 (9th Cir. 1986) (the short form agreement stated it "shall continue in effect for the same term as the applicable multiple-employer labor agreements and for any renewals or extensions thereof, unless [appropriate notice is given]") (emphasis added); Kemmis v. McGoldrick, 767 F.2d 594, 595 (9th Cir. 1985) (the short form agreement provided it would "continue in effect for the same term as the applicable multiple-employer labor agreements and for any renewals and extensions thereof, unless [appropriate notice is given]") (first emphasis added); and Construction Teamsters Health and Welfare Trust v. Con From Constr. Corp., 657 F.2d 1101, 1103 (9th Cir. 1981) (the short form agreement provided that it "shall continue in effect for the same term as the Master Labor Agreement and for any renewals and extensions thereof ..., and, thereafter, unless and until [appropriate notice is given]") (first emphasis added).
 
 
 22
 We construe an ambiguity in the language of a contract against the drafter. See Sutter Home Winery, Inc. v. Vintage Selections, Ltd., 971 F.2d 401, 406 (9th Cir. 1992). The Union drafted the 1984 letter of assent. Because it contains conflicting and ambiguous termination provisions, we cannot agree with the Union that GES's failure to give notice of its intention not to renew the 1984 letter of assent at least sixty days prior to May 31, 1985 automatically bound it to the subsequent ILAs.
 
 
 23
 Pursuant to the express terms of the 1984 letter of assent, GES agreed "to comply with all of the terms and conditions of employment contained in the above mentioned [1981-1985 ILA] agreement and all approved amendments thereto." (emphasis added). The Union contends that the subsequent ILAs for 1985-1987, 1987-1990, and 1990-1993 were merely "approved amendments" to the 1981-1985 ILA. We reject this contention.
 
 
 24
 The 1981-1985 ILA provided that it "shall continue in effect from year to year [after May 31, 1984], from June 1 through May 31 of each year, unless changed or terminated in the way later provided herein." If the parties changed the terms of the ILA after May 31, 1984, the ILA no longer remained in effect: a new, changed ILA would take its place. Thus, whether the 1981-1985 ILA was changed by mutual consent or through negotiations of disputed proposed changes, it was nevertheless changed. Once the ILA was changed, the provisions of section 1.1 applied, and the ILA was no longer "in effect."
 
 
 25
 Moreover, each of the subsequent ILAs is a separate document. Each ILA was negotiated, signed, and published as an independent agreement. Each stated the length of time for which it was valid and made no reference to earlier agreements. In each instance, the terms of the ILA were negotiated following notification that the Union desired to open for discussion various articles, sections, and clauses of the current ILA.
 
 
 26
 Finally, each subsequent ILA incorporates significant changes in comparison to the previous ILA. For instance, the numerous changes between the 1981-1985 ILA and the 1985-1987 ILA demonstrate that they were separate agreements. In Article I, the 1985-1987 ILA introduced an entirely new section designed to keep other contractual provisions in effect after a matter in dispute is resolved. Article II of the 1985-1987 ILA omitted part of the most favored employer clause, changed the compensation structure for workers referred by the Union who were rejected, and deleted provisions regarding nondiscrimination in Union membership, the time limitations for the Appeals Committee to meet, and the separability clause if a court adjudged any provision of the ILA to be unlawful.
 
 
 27
 Article III of the 1985-1987 ILA changed the regular work day from seven hours to eight hours, altered the regular work week from thirty-five hours to forty hours, adjusted overtime pay for the first two hours of overtime from double time to one-and-one-half times straight pay, added a provision that certain work at conventions and expositions would be paid at one-and-one-half times straight pay, changed the pay scales for both regular employees and apprentices, added a section to provide that employees working at a convention and laid off after 5 p.m. would be paid by 10 a.m. the next morning, redesignated geographical areas for which workers would be allowed travel pay, and deleted mileage payments and payment for parking fees. Finally, the Union and NECA changed provisions regarding the apprenticeship program in Article IV of the 1985-1987 ILA and altered required contributions to the Pension Trust Fund in Article V.
 
 
 28
 In light of the 1981-1985 ILA provisions concerning changes, the independent nature of the 1981-1985, the 1985-1987, the 1987-1990, and 1990-1993 ILAs, and the significant changes between the ILAs, the Union's argument that the Union and NECA intended subsequent ILAs to function as amendments rather than new agreements is unpersuasive. We conclude that the subsequent ILAs for 1985-1987, 1987-1990, and 1990-1993 were new and different ILAs and not amendments to the 1981-1985 ILA. Because the letter of assent bound GES only to the current approved ILA and all approved amendments thereto, we hold that the 1984 letter of assent had no further function ex proprio vigore on May 31, 1985. Accordingly, GES was not bound to comply with the terms of any of the subsequent ILAs. Put another way, the 1984 letter of assent was expressly tied to the 1981-1985 ILA which expired May 31, 1985.
 
 
 29
 We reject the Union's reliance on evidence of GES's conduct in complying with the terms of subsequent ILAs to show that GES was bound by the 1991-1993 ILA. On January 25, 1993, the Union, and GES entered into a stipulation and agreement specifying the following: "Greyhound and the Union agree that neither the payment of wages nor the payment of contributions ... nor any other action of compliance with the alleged contract, will be construed as evidence of the existence of a contract between Greyhound and the Union." Thus, the stipulation precludes this court from considering whether an implied-in-fact contract existed that extended the life of the 1984 letter of assent to bind GES to the 1991-1993 ILA.
 
 
 30
 Accordingly, we hold that GES was not bound to the 1990-1993 ILA negotiated between the Union and NECA at the time of the alleged breaches. Because the Union relied upon the 1990-1993 collective bargaining agreement as the basis for federal jurisdiction pursuant to 29 U.S.C. Sec. 185, the district court correctly ruled that it lacked subject matter jurisdiction over this action.
 
 III
 
 31
 The Union also contends that the district court erred in failing to confirm the three arbitration awards rendered against GES. We conclude that the district court properly declined to rule on the enforcement of the arbitration awards once it determined that it lacked subject matter jurisdiction.
 
 
 32
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36-3
 
 
 [1]
 The 1973 letter of assent executed by Las Vegas Convention Services Co. and the Union provided, in pertinent part, that:
 In signing this letter of assent, the undersigned firm does hereby authorize Southern Nevada Chapter, NECA, as its collective bargaining representative for all matters contained in or pertaining to the current approved Inside Electrical Construction Labor Agreement between the Southern Nevada Chapter, NECA, Inc. and Local Union No. 357, IBEW. This authorization, in compliance with the current approved labor agreement, shall become effective on the first day of June 1972. It shall remain in effect until terminated by the undersigned employer giving written notice to the Southern Nevada Chapter, NECA, and to the Local Union at least one hundred fifty (150) days prior to the then current anniversary date of the aforementioned approved labor agreement.
 
 
 [2]
 Accordingly, the "current approved" ILA is most accurately referred to as the 1981-1984 ILA as amended to extend the expiration date to May 31, 1985. For ease of reference, however, we will refer to the "current approved" ILA hereinafter as the "1981-1985 ILA."
 The Union contends that the district court erred in identifying the agreement as the "1981-1985 ILA" because there was no evidence to support the existence of a one-year extension. We disagree. GES asserted in its cross-motion for summary judgment that the 1981-1984 ILA was extended until May 31, 1985 by agreement of NECA and the Union. The Union failed to object to this statement in its pleading or at the summary judgment hearing, failed to submit evidence controverting GES's assertion, and even affirmatively referred to a "1981-1985" ILA in its reply brief. The district court properly relied upon both parties' characterization of the "1981-1985 ILA." See International Union of Bricklayers & Allied Craftsman Local No. 20 v. Martin Jaska, Inc., 752 F.2d 1401, 1404 (9th Cir. 1985) (This court will not review an issue not raised below absent exceptional circumstances; "[i]n the absence of such circumstances, appellants may not upset an adverse summary judgment by raising an issue of fact on appeal that was not plainly disclosed as a genuine issue before the trial court.")
 
 
 [3]
 Section 2.12 provides, in pertinent part, that:
 A steward will not be laid off or fired (except for a gross misconduct such as intoxication or drinking of intoxicating beverages, fighting or stealing, on the job[)] until the matter has first been discussed with the union.
 Section 3.07 provides, in pertinent part, that:
 Any workman laid off or discharged by the employer shall be paid all his wages immediately.
 Section 3.09 provides as follows:
 Any employee reporting for work and being laid off, any man not having been notified the day previous, of a lay off shall receive not less than (4) hours' wages.
 
 
 [4]
 29 U.S.C. Sec. 185 provides, in pertinent part, that:
 Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
 29 U.S.C. Sec. 185(a) (1988).