*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2001 FED App. 0223P (6th Cir.)
File Name: 01a0223p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

SHEET METAL WORKERS,
INTERNATIONAL
ASSOCIATION, Local Union
No. 24,
       *Plaintiff-Appellee,*

     *v.*

ARCHITECTURAL METAL
WORKS, INC.,
       *Defendant-Appellant.*

No. 00-3336

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 98-01209—Joseph P. Kinneary, District Judge.

Argued: March 7, 2001

Decided and Filed: July 17, 2001

Before: KRUPANSKY, BOGGS, and BATCHELDER,
Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Roger L. Sabo, SCHOTTENSTEIN, ZOX & DUNN, Columbus, Ohio, for Appellant. Jerry A. Spicer, SNYDER, RAKAY & SPICER, Dayton, Ohio, for Appellee. **ON BRIEF:** Roger L. Sabo, SCHOTTENSTEIN, ZOX & DUNN, Columbus, Ohio, for Appellant. Jerry A. Spicer, SNYDER, RAKAY & SPICER, Dayton, Ohio, for Appellee.

KRUPANSKY, J., delivered the opinion of the court, in which BOGGS, J., joined. BATCHELDER, J. (pp. 24-27), delivered a separate dissenting opinion.

———————————

## OPINION

———————————

KRUPANSKY, Circuit Judge. The defendant-appellant Architectural Metal Works, Inc. ("Architectural") has contested the district court's summary judgment for the plaintiff-appellee Sheet Metal Workers, International Association, Local 24, Columbus Area ("the Union") by which it enforced an award of the National Joint Adjustment Board for the Sheet Metal Industry ("NJAB"), a private alternative dispute resolution body composed of equal numbers of labor and management delegates. The NJAB had mandated that Architectural was bound by the terms of a 1997-2000 collective bargaining agreement entered into between the Union and the Sheet Metal Contractors Association of Central Ohio ("the Association"), a multi-employer trade association which represents the interests of member sheet metal enterprises in central Ohio, because Architectural had voluntarily assented to the terms of the predecessor 1994-97 collective bargaining agreement between the Union and the Association. This agreement included an alleged pledge to either accept the terms of a successor renewal contract between the Union and the Association,

Association would have no reason to execute a letter of assent. Alternatively, if a letter of assent bound a party to the same terms contained in the agreement itself, the provisions of the letter of assent would be of no consequence. Moreover, accepting the Union's position provides for interest arbitration in a one-sided manner: under the terms of Article X, Section 8(a) only Local 24 or "the Local Contractor's Association" can invoke the jurisdiction of the NJAB. A contractor in Architectural's position cannot. In practical effect, the Union asks us to construe the Agreement as allowing it to invoke the interest arbitration clause in its sole discretion. The majority acknowledges this problem and rewrites the agreement to allow Architectural to invoke the agreement's interest arbitration procedures by "stepping into the shoes" of the Association. A more natural interpretation of the agreement, however, compels either enforcement of an inequitable interest arbitration clause against contractors in Architectural's position or acceptance of Architectural's argument that in signing the Letter of Assent it did not agree to the interest arbitration clause at all.

Most importantly, I think that the Union's construction of the Letter of Assent and the collective bargaining agreement violates a fundamental policy of federal labor law by requiring Architectural to submit to arbitration a matter it had not agreed so to submit. *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960). I respectfully dissent.

interest arbitration clause is a nonmandatory subject of bargaining since it relates to the relationship between the parties rather than to wages, hours, or other terms and conditions of employment." *Laidlaw Transit, Inc.*, 323 N.L.R.B. 867, 869 (1997). *See also Sheet Metal Workers Int'l Ass'n, Local 14 v. Aldrich Air Conditioning, Inc.*, 717 F.2d 456, 458 (8th Cir. 1983); *Milwaukee Newspaper & Graphic Communications Local No. 23 v. Newspapers, Inc.*, 586 F.2d 19, 21 (7th Cir. 1978); *NLRB v. Sheet Metal Workers Int'l Ass'n, Local Union No. 38*, 575 F.2d 394, 398 (2d Cir. 1978); *NLRB v. Massachusetts Nurses Ass'n*, 557 F.2d 894, 897-98 (1st Cir. 1977); *NLRB v. Greensboro Printing Pressmen & Assistants' Union No. 319*, 549 F.2d 308, 308-09 (4th Cir. 1977) (per curiam); *NLRB v. Columbus Printing Pressmen & Assistants' Union No. 252*, 543 F.2d 1161, 1164-66 (5th Cir. 1976). That interest arbitration clauses are nonmandatory subjects of bargaining demonstrates that courts and the NLRB in interpreting federal labor law regard interest arbitration as fundamentally distinct from "the terms and conditions of employment." Against this background the parties could not have understood Architectural's promise to comply with the Agreement's "terms and conditions of employment" as extending to the interest arbitration clause.

Additionally, I think that only Architectural's reading rationalizes every term and provision of the documents at the center of this case. By signing the Letter of Assent rather than the collective bargaining agreement, Architectural specifically opted not to agree to interest arbitration.[2] Had it wanted to do so, Architectural could have signed the Agreement itself or designated the Association as its bargaining representative. A conclusion to the contrary renders either the Article XII signature block or the Letter of Assent wholly superfluous. A contractor signing the agreement or belonging to the

---

[2]Architectural may also have sought to avoid designating the Association as its bargaining representative pursuant to Article XII, Section 4.

bargain independently in good faith with the Union for separate terms for the consecutive contract period, or submit the matter to binding arbitration before the NJAB if the Union and Architectural should fail to agree upon contract renewal terms.

At all times relevant to this litigation, Architectural, a small local construction contractor based in Galena, Ohio, engaged in the fabrication of sheet metal roofing seam components and the installation of those materials on commercial and industrial structures. It bid competitively for its roofing contracts. Historically, Architectural has employed between one and five laborers on a "per-job" basis. The Union exclusively represented the organized sheet metal workers within its territorial jurisdiction in negotiations with area employers regarding wages, hours, and terms and conditions of employment. Since at least June 1, 1991, the Union has sequentially negotiated "pre-hire" collective bargaining agreements[1] of three years' duration with the Association.

---

[1]"Pre-hire agreements" are collective bargaining contracts negotiated between a labor union and an unorganized construction industry shop or a trade association representing multiple non-unionized construction trade employers. *Sheet Metal Workers Int'l Assoc. Local 110 Pension Trust Fund v. Dane Sheet Metal, Inc.*, 932 F.2d 578, 579 (6th Cir. 1991). The Fourth Circuit has recently furnished a useful explication of the "pre-hire agreement:"

As general rule, it is an unfair labor practice under [29 U.S.C. § 158(a)(1) & (2); National Labor Relations Act ("NLRA")] sections 8(a)(1) and (2) for an employer, and under [29 U.S.C. § 158(b)(1)(A); NLRA] section 8(b)(1)(A) for a union, to enter into a collective bargaining agreement when only a minority of employees has chosen the union as its bargaining representative. However, under [NLRA] section 8(f) [29 U.S.C. § 158(f)] there is an exception for the construction industry because of special factors, such as the "uniquely temporary, transitory, and sometimes seasonal nature" of much of the work in that industry. Specifically, section 8(f) allows employers and unions in the construction industry to enter into labor agreements (commonly called "prehire" agreements) before a majority of employees has

Architectural had never formally joined the Association's membership.  Nonetheless, on February 22, 1993, an authorized officer of the defendant company executed a separate one-page "Letter of Assent," which stated, in material part:

   This is to certify that the undersigned firm [Architectural] has examined and does agree to comply with the terms and conditions of employment contained in the collective bargaining agreement by and between Sheet Metal Workers' Local Union # 24 and the Sheet Metal Contractors of Central Ohio, effective June 1, 1991 through May 31, 1994.

   It is further agreed that the signing of this letter of assent shall be as binding on the undersigned firm as though it had signed the above referred agreement and any amendments thereto.

Prior to the May 31, 1994 expiration of the three-year "pre-hire" labor contract, the Union and the Association negotiated a successor collective bargaining agreement, to be effective between June 1, 1994 and May 31, 1997.  On November 3, 1994, Architectural voluntarily executed a second Letter of Assent; its pertinent verbiage was identical to the initial

---

approved the union as its bargaining representative.  These section 8(f) agreements are voluntary[.]"

*Local Union No. 666 v. Stokes Electrical Service, Inc.*, 225 F.3d 415, 418-19 (4th Cir. 2000) (citations omitted).

   The 1994-97 "pre-hire" agreement relevant to the subject litigation generally conformed to a basic model sheet metal industry "pre-hire" contract format, which was denominated "Standard Form of Union Agreement, Form A – 3-91, Sheet Metal, Roofing, Ventilating and Air Conditioning Contracting Divisions of the Construction Industry, and Addendums."  Articles I through XII, inclusive, of that labor compact contained industry-standard contractual stipulations, with some variations not material to this action unless herein noted.

standard form as the Letter of Assent executed in this case).  Accordingly, the terms of a letter of assent determine the obligations of a party. *International Bhd. of Elec. Workers, Local 537 v. Greyhound Exposition Servs., Inc.*, No. 94-16814, 1995 WL 430244, at *6 (9th Cir. July 20, 1995) (mem.) (holding that the terms of a letter of assent only bind an employer to the contract in effect at signing, not subsequent amendments).  Therefore, the question becomes what this Letter of Assent means.

   The majority accepts the Union's reliance on the Letter of Assent's second sentence, which makes the Letter of Assent "as binding on the undersigned firm as though it had signed the above referred agreement and any Amendments thereto."  For two reasons, this sentence does not end the inquiry. First, the sentence references what comes before it in defining what binds Architectural.  Second, it only outlines the effect of signing the Letter of Assent, not the terms thereby incorporated.  In other words, this sentence precludes Architectural from defending against a grievance by maintaining that the Letter of Assent did not constitute a valid, legally binding promise to comply with the agreement's terms and conditions of employment, but says nothing about Architectural's legal rights and obligations as an employer.

   Embodying the substantive agreement between the parties, the Letter of Assent's first sentence provides that Architectural "has examined and does agree to comply with the *terms and conditions of employment* contained in the collective bargaining agreement."  (Emphasis added.)  Use of the phrase "terms and conditions of employment," a specialized term of art in federal labor law, demonstrates that in signing the Letter of Assent Architectural did not agree to interest arbitration.  For purposes of an employer's duty to bargain under section 8(a) of the NLRA, 29 U.S.C. § 158(a), interest arbitration clauses constitute a nonmandatory subject of bargaining because of their "remote or incidental relationship to terms or conditions of employment." *Latrobe Steel Co. v. NLRB*, 630 F.2d 171, 177 (3d Cir. 1980).  "[A]n

———————————

**DISSENT**

———————————

ALICE M. BATCHELDER, Circuit Judge, dissenting. What distinguishes this case from *Dane Sheet Metal*, *W.D. George Construction*, and all other reported cases is the Letter of Assent. In other cases, the employer had either signed the collective bargaining agreement itself or belonged to the contractor's association that had. Courts and the NLRB have provided little guidance on the legal effect of executing a letter of assent rather than a collective bargaining agreement. As a matter of logic, a party can only be bound by that to which it agrees according to the terms of the document it actually signs. Because the Letter of Assent Architectural executed neither contains an interest arbitration clause nor incorporates the one found in the collective bargaining agreement, I respectfully disagree with the majority's disposition of this case.

Generally, a letter of assent is "a typical short-form agreement by which an employer agrees to be bound by a collective bargaining agreement already negotiated, or about to be negotiated, between a local union and the employer's collective bargaining representative." *National Elec. Benefit Fund v. Heary Bros. Lightning Prot. Co.*, 931 F. Supp. 169, 177 (W.D.N.Y. 1995).[1] A letter of assent and a collective bargaining agreement "are separate agreements, which are intended to perform different functions." *Carpenter's Local 1471 v. Bar-Con, Inc.*, 668 F. Supp. 560, 566 (S.D. Miss. 1987) (construing a letter of assent based upon the same

———————————

[1] Standardized versions of such agreements come in two varieties. A "Letter of Assent A" creates an ongoing relationship between an employer and a union and has no specific termination date. *McDonald v. Hamilton Elec., Inc. of Fla.*, 666 F.2d 509, 511 n.2 (11th Cir. 1982); *Heary Bros.*, 931 F. Supp. at 177. Like the Letter of Assent in this case, a "Letter of Assent B" binds an employer for a specific period of limited duration. *Id.*

February 22, 1993 Letter of Assent, quoted above, excepting only that the second letter identified the "pre-hire" contract "effective June 1, 1994 through May 31, 1997."

The master 1994-97 "pre-hire" collective bargaining agreement, in Article XII, Section 1, stipulated that its terms would remain in effect until May 31, 1997, unless certain specified conditions were to prevail:

> This Agreement and Addendums attached hereto shall become effective on the First day of June, 1994, and remain in its full force and effect until the 31st day of May, 1997, and *shall continue in force from year to year thereafter unless written notice of reopening is given not less than Ninety (90) days prior to the expiration date. In the event such notice of reopening is served,* this Agreement shall continue in its force and effect until conferences relating thereto have been terminated by either party by written notice, provided, however, that *if this Agreement contains Article X, Section 8* [quoted below], *it shall continue in full force and effect until modified by order of the National Joint Adjustment Board or until the procedures under Article X, Section 8 have been otherwise completed.*

(Emphases added). (Article XII, § 1 is sometimes referred to herein as the "extension clause.").

Article X of the 1994-97 "pre-hire" labor contract between the Union and the Association contained the above-referenced optional Section 8. Article X recited, in pertinent segment:

> The Union and the Employer, *whether party to this Agreement independently* or as a member of a multi-employer bargaining unit, agree to utilize and be bound by this Article.

> . . . .

SECTION 8. – In addition to the settlement of grievances arising out of interpretation or enforcement of this Agreement as set forth in the preceding sections of this Article, *any controversy or dispute arising out of the failure of the parties to negotiate a renewal of this Agreement shall be settled as hereinafter provided*:

a) *Should the negotiations for renewal of this Agreement become deadlocked in the opinion of the Local Union or of the Local Contractor's Association, or both, notice to that effect shall be given to the National Joint Adjustment Board.*

(Emphases added). (Article X, § 8 is sometimes referred to herein as the "interest arbitration clause."). Subsection 8A of that proviso posited, among other things, that a subsequent decision by the NJAB, or a duly designated subcommittee of its members, which resolves a negotiation stalemate, "shall be final and binding upon the parties."

On or about February 14, 1997, the Union timely posted a certified notice addressed to Architectural which announced that, in accordance with Article XII of the "pre-hire" agreement, the Union elected to reopen the collective bargaining relationship for negotiation of a new labor contract. Herman ("Butch") Immel ("Immel"), Architectural's Secretary and Field Superintendent, testified that, during the spring of 1997, he informed Donald Stiltner and Doug Biggs, the Union's Business Representatives, and Charles Frazier, the Union's Business Manager and Financial Secretary, that Architectural was terminating its voluntary collective bargaining relationship with the Union.[2] Immel

---

[2] By contrast, the Union's witnesses have attested, via affidavits, that Architectural initially advised on September 9, 1997 that it intended to sever its relationship with the Union and the Association. The Union has evidenced that, both prior to and following June 1, 1997, Architectural had promised to execute a Letter of Assent by which it would participate in the 1997-2000 "pre-hire" contract between the Union and the

employment, which had been memorialized in the collective bargaining agreement adopted by the Union and the Association, for the duration June 1, 1997 through May 31, 2000. However, on May 31, 2000, that NJAB-created agreement finally lapsed. No consecutive labor agreement can be imposed against Architectural in the absence of its voluntary assent.

Accordingly, after carefully considering each argument mounted by the defendant Architectural, and construing all record evidence in the light most favorable to it, the district court's summary judgment for the plaintiff Union, which had sustained the NJAB's award against Architectural, is **AFFIRMED**, to the extent that it ratified the NJAB's incorporation of covenants and conditions which concerned mandatory subjects of collective bargaining, namely wages, hours, and other terms and conditions of employment, into an arbitrator-fabricated "pre-hire" labor contract between the Union and Architectural spanning June 1, 1997 to May 31, 2000. However, this cause is **REMANDED** to the district court for such necessary further proceedings as are consistent with this opinion, including, but not necessarily limited to, the exclusion from the NLRB-fashioned "pre-hire" contract, of any "interest arbitration clause," "extension clause," and/or other provision(s) which did not directly address a mandatory subject of collective bargaining. *See Int'l Bhd. Elec. Workers*, 43 F.3d at 1033.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS**.

*Id.* at 1032 (emphasis added; citations omitted). Hence, if the 1997-2000 master "pre-hire" labor agreement between the Union and the Association included any "interest arbitration" and/or "extension" clause(s), and/or any other covenant or condition which did not directly implicate a mandatory subject of collective bargaining, such term(s) shall be deemed null, void, and unenforceable against Architectural.

Consequently, the NJAB validly imposed against Architectural the identical covenants and conditions governing wages, hours, and other terms and conditions of

---

*Contractors Assoc., Inc.*, 43 F.3d 1026, 1032 (6th Cir. 1995), the union had expressly objected to the inclusion of an "interest arbitration" clause in the arbitrator-composed successor labor contract; therefore the Sixth Circuit did not confront a situation in which the party opposing the arbitration award had *not* articulated a specific objection to inclusion of a successor "interest arbitration" clause. However, as observed by the court of appeals, "interest arbitration as to non-mandatory subjects is 'void as contrary to public policy.'" *Id.* Thus, even in the absence of a specific objection, any arbitrator-imposed covenant or condition which does not directly address a mandatory subject of collective bargaining must be avoided as against public policy regarding any party which did not explicitly assent to it.

   *Accord Local Union No. 666 v. Stokes Electrical Service, Inc.*, 225 F.3d 415, 425 (4th Cir. 2000) ("as a matter of law the new Agreements could not have provided for unilateral interest arbitration. Because an 'interest arbitration clause is a non-mandatory subject of bargaining,' *parties may be bound to such a clause in a future contract only by mutual consent.*") (emphasis added) (*citing Sheet Metal Workers Int'l Assoc. Local Union No. 420 v. Huggins Sheet Metal*, 752 F.2d 1473, 1475 (9th Cir. 1985)); *Beach Air Conditioning and Heating, Inc. v. Sheet Metal Workers*, 55 F.3d 474, 478 (9th Cir. 1995) ("the self-perpetuation [of a contract renewal covenant contained in an existing "pre-hire" agreement] is limited; nothing says a renewed agreement must itself contain a renewal clause. The employer can bargain for a renewal contract for a fixed period or one containing a termination option. If the union refuses these terms and negotiations reach a deadlock, *no agreement imposed by an arbitrator can contain an interest arbitration clause. Thus, under the original agreement Beach was obligated at most to negotiate or accept the imposition of one more contract for a limited number of years.*") (emphasis added; citations omitted).

---

explained that competitor local sheet metal construction contractors which employed non-organized craftsmen had underbid Architectural for numerous seam metal roofing contracts because of prevailing lower free-market wage rates. Effective June 1, 1997, Architectural ceased contributing to the Union's fringe benefit funds.

On December 9, 1997, the Union initiated, before the National Labor Relations Board ("NLRB" or "the Board"), an unfair labor practice charge against Architectural by which it alleged, *inter alia*, that Article X, § 8 and Article XII, § 1 of the 1994-97 collective bargaining agreement *compelled* Architectural to bargain with the Union concerning the terms and conditions of a successor three-year "pre-hire" agreement, but Architectural had failed to do so.

On January 14, 1998, a staff attorney employed by the NLRB's Regional Office in Cincinnati, Ohio ("Region 9"), pronounced, in an opinion letter delivered to the Union's lawyer, that neither the 1994-97 master contract's "extension," nor its "interest arbitration," clauses were implicated in the subject circumstances, because no ongoing negotiations between the Union and Architectural had "deadlocked." Rather, Architectural had instead elected *not to negotiate*, because it had resolved not to renew its voluntary relationship with the Union following the purported May 31, 1997 expiration of the existing collective bargaining agreement rather than undertake the negotiations assertedly impelled by the Union's timely "letter of reopening." The NLRB counselor explained:

   I am sorry to inform you that the Regional Office has determined to dismiss the above-referenced charge,

---

Association; and that the defendant took various actions during June 1997 which were consistent with that representation. However, because Architectural opposes the lower court's summary judgment for the Union, this reviewing court must accept Architectural's version of disputed facts as true. *See Painter v. Robertson*, 185 F.3d 557, 566 (6th Cir. 1999).

absent withdrawal.   The Region carefully considered your argument that Article X Section 8 [the "interest arbitration clause"] coupled with Article XII Section 1 [the "extension clause"] of the applicable contract binds the Employer to one more contract under the facts of this case.

The Region concluded that the year to year renewal provision of Article XII Section 1 of the contract was effectively forestalled by the Union's letter of reopener [sic] sent to the Employer on or about February 14, 1998 [sic -- 1997].  The Region also considered the caveat to Section 1 that the "Agreement shall continue in full force and effect . . . until modified by the National Adjustment Board or until the procedures under Article X, Section 8 have been otherwise completed."  It appears to the Region, however, that Article X, Section 8 is clearly directed at parties in ongoing negotiations who have deadlocked – far from the situation in the instant case. Therefore it was viewed as inoperative. Moreover, while the National Adjustment Board may apparently fashion a remedy binding an employer to one more contract, there appears to be nothing in Article X, Section 8 indicating that this is a remedy under the contract.

In summation, as the contract has not renewed from year to year, and as the caveat to the automatic renewal clause is inapplicable to the instant situation, the Employer is free to repudiate its relationship with the Union.   To determine otherwise could result in the situation where an employer, having once signed a letter of assent, could be bound in perpetuity to the [29 U.S.C. § 158(f); National Labor Relations Act ("NLRA") §] 8(f) contract at the discretion of the National Joint Adjustment Board.

(Ellipsis in original).

bargain on other matters."  *Id*. (*citing, inter alia,* 29 U.S.C. § 158(d)).

The law of the Sixth Circuit forbids including, in any arbitrator-fashioned labor contract legitimated by a contractual "interest arbitration" clause, any contractual term which does *not* address a legally mandatory subject of collective bargaining, in the absence of the agreement of all parties:

Although interest arbitration of mandatory subjects is permissible, interest arbitration is not itself a mandatory subject of bargaining.  Moreover, interest arbitration as to non-mandatory subjects is "void as contrary to public policy."   Consequently, *the law is clear that an arbitrator may not use an interest arbitration clause as a means of self-perpetuation, and that this type of "second generation" interest arbitration clause cannot be included over another party's objection.*[13]

---

[13]Because Architectural did not appear before the NJAB subcommittee, it did not specifically "object" to the NJAB's insertion of "interest arbitration" and/or "extension" clauses into the NJAB-crafted 1997-2000 labor agreement between the Union and Architectural. However, by declining to appear before the NJAB in reliance upon the NLRB's advisories that it was not required to negotiate contract renewal terms with the Union, Architectural in effect had *constructively* objected to the imposition by the NJAB of *any* provision(s) of a contractual relationship with the Union which extended past the ostensible May 31, 1997 expiration of the 1994-97 collective bargaining agreement to which Architectural had voluntarily assented.   Although Architectural's generalized objection to any and all contract clauses mandated by the NJAB did not forestall the NJAB from crafting the covenants and conditions of a labor-management agreement between the Union and Architectural which impacted the mandatory subjects of collective bargaining, namely wages, hours, and other terms and conditions of employment, it was sufficient to bar the NJAB from imposing any contract proviso which exceeded those boundaries, including any "extension" and/or "interest arbitration" clause(s).

In any event, in *Local 58, International Brotherhood of Electrical Workers v. Southeastern Michigan Chapter, National Electrical*

the terms of an existing agreement and applying them to a particular set of facts. Rather, he *is acting as a legislator, fashioning new contractual obligations.* Consequently, *we recognize that **even greater deference** must be paid to the arbitrator's decision, once it is established that he had the authority to resolve the issue.*

*Id.* (Italics and boldface added; citations omitted).

Therefore, the NJAB's edict that Architectural must accede to a collective bargaining agreement with the Union "effective June 1, 1997 -- May 31, 2000 that incorporates the same terms and conditions as the current building trades agreement between" the Union and the Association was not subject to judicial reassessment, at least regarding the NJAB's importation of the *substantive covenants and conditions governing the labor-management relationship* contained within the June 1, 1997 to May 31, 2000 master "pre-hire" collective bargaining agreement consummated between the Union and the Association. *See id.* at 1030-33; *see also Dane Sheet Metal*, 932 F.3d at 581-82.

However, the NJAB did *not* have the power to add any "interest arbitration clause," or "extension clause," to the new June 1, 1997 – May 31, 2000 labor agreement which it had created for the Union and Architectural, irrespective of the incorporation of such clauses into the master 1997-2000 collective bargaining agreement approved by the Union and the Association, because the predecessor 1994-97 agreement had contractually bound Architectural *only* to negotiate a successor three-year labor contract which addresses the subjects of collective bargaining which would be mandatory under the NLRA if the Union had been the duly certified labor representative of Architectural's workers. *See Local 58, Int'l Bhd. Elec. Workers*, 43 F.3d at 1032. "In *NLRB v. Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342, 349 (1958), the Supreme Court held that the duty to bargain in good faith is limited to the subject of wages, hours, [and] terms and conditions of employment. Neither party is required to

Subsequently, the Union objected to that opinion, which prompted Region 9 to refer the controversy to the Board's headquarters in Washington, D.C. for additional guidance.

In the meantime, the Union, on February 3, 1998, instituted a parallel complaint against Architectural before the NJAB, presented on a standardized NJAB form entitled "Collective Bargaining Reporting Form, Notice of Unresolved Dispute, Article X Section 8." The Union alleged thereon that Architectural had violated the 1994-97 collective bargaining agreement by refusing to negotiate contract renewal terms following the Union's proper "notice of reopening," which averredly constituted a "deadlock" of mandatory negotiations, which in turn activated the NJAB's contractually-bestowed jurisdiction to resolve the alleged bargaining impasse.

On February 18, 1998, an Assistant General Counsel for the NLRB in Washington, D.C. opined that Region 9 had correctly rejected the Union's unfair labor practice charge against Architectural.[3]   In accordance therewith, on

---

[3] The NLRB's February 18, 1998 advice letter to Region 9 directed:

> This case was submitted for advice as to whether an employer that had signed letters of assent to previous collective-bargaining agreements between a multi-employer association and a union is bound to the current agreement between the union and the association, even though it never signed a letter of assent for that contract.
>
> We agree with the Region, for the reasons cited in its request for advice, that the Employer is not bound to the current contract because it never became a member of the bargaining unit represented by the multi-employer association and never otherwise authorized the association to bargain on its behalf for agreements other than the ones for which it had signed letters of assent. Accordingly, the Employer did not violate the [National Labor Relations] Act by failing to abide by the current contract, and the charge should be dismissed, absent withdrawal.

(Footnote omitted).

February 26, 1998, Region 9 alerted the Union's counsel that Architectural was not compelled to abide by the new collective bargaining agreement entered into between the Union and the Association for the period June 1, 1997--May 31, 2000. Consequently, on March 12, 1998, the Union voluntarily withdrew its unfair labor practice charge against Architectural.

Nonetheless, the Union's related complaint against Architectural before the NJAB remained pending. On May 28, 1998, following written notice to both parties, a two-person "subcommittee" of the NJAB convened to hear the Union's charge that Architectural had violated the 1994-97 "pre-hire" collective bargaining agreement by refusing to negotiate contract renewal terms for the period 1997-2000. Architectural declined to appear at that proceeding or to submit any evidence in its defense, averredly relying upon the NLRB's previous directives that the 1994-97 contract had *not* committed Architectural to negotiate post-May 31, 1997 renewal terms with the Union.

On June 15, 1998, the NJAB panel issued a unanimous two-paragraph resolution of the Union's claim, which propounded:

> After review of all information provided, the Subcommittee determined that Architectural Metal had refused to negotiate.

> It is the unanimous decision of the Subcommittee that Architectural Metal and SMWIA Local 24 [the Union] enter into an agreement effective June 1, 1997 – May 31, 2000 that incorporates the same terms and conditions as the current building trades agreement between Sheet Metal Contractors of Central Ohio [the Association] and SMWIA Local 24.

Thereafter, Architectural refused to comply with the Union's repeated demands that it execute a Letter of Assent

*Southeastern Mich. Chap., Nat'l Elec. Contractors Assoc., Inc.*, 43 F.3d 1026, 1030 (6th Cir. 1995). An arbitrator's *"grievance arbitration"* award, which entails the interpretation and application of provisions of an existing collective bargaining agreement, should be sustained if it "draws its essence from the agreement." *Id*. "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, [the award should be sustained;] that a court is convinced he committed serious error does not suffice to overturn his decision."[12] *Id*. (*quoting Federated Dep't Stores, Inc. v. J.V.B. Indus., Inc.*, 894 F.2d 862, 866 (6th Cir. 1990)).

Moreover, an arbitrator's resolution of an *"interest arbitration"* controversy, which necessitates dictation of the substantive contractual terms which will prevail in a new collective bargaining relationship of finite duration to follow the expiration of an existing labor agreement, is entitled to comparatively even *greater* judicial respect than the already elevated degree of court deference accorded to "grievance arbitration" decisions:

> We find that this framework of analysis, formulated in the context of grievance arbitration, is applicable to interest arbitration with slight modification. *Interest arbitration*, unlike grievance arbitration, *focuses on what the terms of a new agreement should be*, rather than the meaning of the terms of the old agreement. *Thus, the arbitrator* is not acting as a judicial officer, construing

---

[12]*See generally Appalachian Regional Healthcare, Inc. v. United Steelworkers of America*, 245 F.3d 601, 604 (6th Cir. 2001) ("Review of an arbitrator's award is necessarily limited. A reviewing court will not replace an arbitrator's construction of the Agreement with its own interpretation. 'The Supreme Court has made clear . . . that courts must accord an arbitrator's decision substantial deference because it is the arbitrator's construction of the agreement, not the court's construction, to which the parties have agreed.'") (ellipsis in original) (*quoting Beacon Journal Publishing Co. v. Akron Newspaper Guild, Local 7*, 114 F.3d 596, 599 (6th Cir. 1997)).

Because the Union had timely notified Architectural of its desire to negotiate the terms of a new "pre-hire" collective bargaining agreement for the approaching three-year contract duration, a contractual duty bound Architectural, by operation of the "interest arbitration clause," to negotiate renewal terms in good faith.[10]  *See id*. at 579-82 & n.1.  Architectural's refusal to bargain interposed a negotiation logjam which, by authority of the "interest arbitration" clause, the Union properly submitted to the NJAB for resolution; consequently, Architectural was contractually bound to accept the solution formulated by the NJAB to the parties' bargaining stalemate.[11]  *Id*. at 581-82. Accordingly, the NJAB possessed proper contractually-created "interest arbitration" jurisdiction to resolve the Union's and Architectural's negotiation standstill.

Once an arbitrator's contractual jurisdiction to resolve a labor dispute is established, judicial review of the arbitrator's substantive decision is strictly limited, irrespective of whether the subject award had resolved a "grievance" or an "interest" conflict.  *See Local 58, Int'l Bhd.. of Elec. Workers v.*

---

[10]*See Sheet Metal Workers Int'l Assoc. Local 110 Pension Trust Fund v. Dane Sheet Metal, Inc.*, 932 F.2d 578, 582 (6th Cir. 1991) ("Article X, § 8 does seem to embody a requirement that the parties engage in negotiations.  It is true, as Dane argues, that 'arbitration does not create a bargaining obligation,' but the contract itself may create a bargaining obligation, just as the contract may provide for interest arbitration if the bargaining breaks down.") (brackets omitted); *see also Beach Air Conditioning and Heating, Inc. v. Sheet Metal Workers*, 55 F.3d 474, 476-78 (9th Cir. 1995) (construing standard sheet metal industry "interest arbitration" and "contract extension" verbiage to contractually bind each assenting employer, following the union's timely service of a notice to reopen negotiations, to either re-negotiate terms for a new agreement or submit to terms fashioned by an arbitration board).

[11]Of course, by virtue of the "extension clause," the 1994-97 contract had remained in effect between the Union and Architectural until the NJAB delivered its June 15, 1998 award.  However, by the terms of that award, the labor contract imposed by the NJAB upon Architectural became retroactively effective as of June 1, 1997.

---

to the 1997-2000 "pre-hire" agreement,[4] or to otherwise abide by the NJAB's award.

On December 2, 1998, the Union launched a two-count complaint against Architectural in federal district court, by which it sought judicial enforcement of the NJAB's edict as constituting a valid exercise of its contractually-bestowed arbitral authority under the 1994-97 "pre-hire" agreement as between the Union and Architectural. *See* 29 U.S.C. § 185(a). Count One alleged that the "extension" and "interest arbitration" clauses of the 1994-97 labor agreement, taken together, mandated that Architectural must negotiate with the Union for contract extension terms following proper "notice of reopening" given by the Union, and its failure to do so comprised a negotiation "deadlock" which empowered the NJAB, upon application by the Union, to impose substantive contract terms upon Architectural for the renewal interval. Count Two incorporated Count One's allegations by reference, but additionally asserted that Architectural's refusal to honor the NJAB's binding award has caused as-yet-

---

[4]The master labor agreement between the Union and the Association governing the interval June 1, 1997 through May 31, 2000 was omitted from the Joint Appendix.  The affidavit of Charles Frazier, the Union's Business Manager and Financial Secretary, cryptically represented that the June 1, 1997 through May 31, 2000 "pre-hire" agreement "does not contain an interest arbitration clause."  However, no record proof evinced that Frazier was trained in the law, or was otherwise competent to reliably conclude that no provision(s) of the 1997-2000 collective bargaining agreement between the Union and the Association could be construed to impose an "interest arbitration" obligation.  In any event, the construction of unambiguous contract terms is strictly a judicial function; the opinions of percipient or expert witnesses regarding the meaning(s) of contractual provisions are irrelevant and hence inadmissible.  *See North American Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1281 (6th Cir. 1997).

Accordingly, as an analytical precaution, this reviewing court has assumed *arguendo* that the 1997-2000 master collective bargaining contract contained "extension" and "interest arbitration" clauses substantially similar to those set forth in the predecessor 1994-97 "pre-hire" contract to which Architectural had assented.

undetermined financial damages to the Union and its members. The Union's judicial complaint requested enforcement of the NJAB's decree; an injunction directing Architectural to execute the 1997-2000 "pre-hire" collective bargaining agreement and to specifically perform in accordance with its provisions; monetary damages; and costs including attorney fees.

In August 1999, the litigants lodged cross-petitions for summary judgment in the district court. On February 3, 2000, the district court denied Architectural's motion but granted the Union's motion, holding that the 1994-97 collective bargaining agreement, coupled with Architectural's Letter of Assent thereto, had required Architectural, under the circumstances, either to voluntarily conjoin the successor "pre-hire" agreement executed by the Association and the Union, to separately negotiate contract renewal terms with the Union, or to arbitrate before the NJAB any failure(s) to agree upon renewal covenants. On February 28, 2000, Architectural timely appealed the lower court's summary judgment for the Union. 28 U.S.C. § 1291.

The keystone issues framed by Architectural primarily concern the construction and application of the 1994-97 collective bargaining agreement's Article X, § 8 (the "interest arbitration clause") coupled with Article XII, § 1 (the "extension clause"). The lynchpin question posed is whether the NJAB had disposed of a controversy between Architectural and the Union which was subsumed within the NJAB's contractually-created arbitral jurisdiction. *See AT & T Technologies, Inc. v. Communication Workers*, 475 U.S. 643, 648 (1986) ("arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.") (citations omitted). If the NJAB possessed jurisdiction over the subject disagreement, the ultimate inquiry then becomes whether its resolution of that conflict was legally proper and enforceable.

scenario, the Association, when bargaining with the Union, would act as the representative of *all* employer parties to the contract, whether or not they were members of the Association.

Therefore, the contracting parties' use of the characterizations "Local Union" and "Local Contractor's Association" did not limit the scope of Article X, Section 8, subpt. (a), to exclude "deadlocked" direct negotiations regarding the provisions of a successor contract between the Union and an individual employer such as Architectural, given the overall language and purpose of the subject sheet metal industry labor agreement. When Architectural repudiated its voluntary adherence to the collective bargain struck between the Union and the Association effective with the May 31, 1997 expiration of the 1994-97 contract, it stepped into the shoes of the Association, its erstwhile collective bargaining agent, for purposes of the "extension clause" and the "interest arbitration clause." *See Sheet Metal Workers Int'l Assoc. Local 110 Pension Trust Fund v. Dane Sheet Metal, Inc.*, 932 F.2d 578 (6th Cir. 1991) (construing a sheet metal industry "pre-hire" agreement containing a proviso denominated Article X, § 8 which was substantially similar to the "interest arbitration clause" implicated in the case in controversy to impose a duty upon an individual employer, which had disassociated itself from the industry's employer representative, to directly negotiate renewal covenants and conditions with the Union for an additional contract period).

*Pension Trust Fund v. Gary's Electric Service Co.*, 227 F.3d 646, 653 (6th Cir. 2000). However, the plaintiff elected to forgo that contention by instead inviting Architectural, via its February 14, 1997 certified notification, to engage in separate direct negotiations with the Union for contract renewal terms as an *independent* employer which was no longer represented by the Association but which was nonetheless bound by the "extension" and "interest arbitration" clauses.

renewal of this Agreement become deadlocked in the opinion of **the Local Union or of the Local Contractor's Association, or both**, notice to that effect shall be given to the National Joint Adjustment Board." (Boldface added). The defendant has claimed that the preceding clause could not apply to it, because it is not a member of the Association, and therefore it would have no reciprocal right to take a "deadlocked" negotiation to the NJAB.

However, Architectural's foundational premise that the Association did not represent it during the term of the 1994-97 "pre-hire" arrangement was misconceived. Article XII, § 4 of the master collective bargaining contract propounded, in part, that "[b]y execution of this Agreement the Employer authorizes Sheet Metal Contractors of Central Ohio to act as its collective bargaining representative for all matters relating to this Agreement."[9] Consequently, in the typical negotiating

---

[9] As previously developed, Architectural's execution of its 1994 Letter of Assent constituted the functional equivalent of execution of the 1994-97 "pre-hire" contract document. See note 8 above.

Article XII, § 4 of the 1994-97 "pre-hire" agreement further stipulated that:

> The parties agree that the employer will hereafter be a member of the multi-Employer bargaining unit represented by said Association unless this authorization is withdrawn by written notice to the Association and the Union at least One Hundred and Fifty (150) days prior to the then current expiration date of this Agreement.

The defendant has evidenced that it notified the Union, at the earliest, during the spring of 1997 that it did not wish to extend its voluntary participation in the "pre-hire" contractual arrangement into the 1997-2000 period. The 1994-97 contract expired on May 31, 1997. Hence, Architectural did not give proper notice to the Union and the Association at least 150 days (approximately five months) prior to May 31, 1997 of its withdrawal from the multi-employer bargaining unit represented by the Association. Thus, Article XII, § 4 could be construed to directly bind Architectural to the 1997-2000 "pre-hire" agreement as an employer represented by the Association. *See, e.g., Electrical Workers Local 58*

Assessment of the enforceability, scope, and meaning of a contractual arbitration clause in a labor agreement typically poses a question of law for *judicial* resolution. *Id.* at 649 ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.") (citations omitted); *see also Beach Air Conditioning and Heating, Inc. v. Sheet Metal Workers*, 55 F.3d 474, 476 (9th Cir. 1995) ("Whether a dispute is subject to arbitration is an issue for the courts rather than the arbitrator to decide.") (citation omitted).[5] Moreover, because the construction of

---

[5] The defendant has protested that both the NJAB, and the district court, should have deferred to the NLRB's conclusion that, because the Union's February 14, 1997 "letter of reopening" had instigated the lapse of the 1994-97 collective bargaining agreement on May 31, 1997, and Architectural elected to discontinue its relationship with the Union coordinate with the 1994-97 agreement's expiration, Architectural was not contractually bound to accept an arbitrator's imposed successor "pre-hire" contract. However, those NLRB advisories did not depend upon findings of disputed essential *historical facts* following an adversary administrative proceeding, nor upon construction of *federal labor laws;* therefore they were entitled to no deference from any jurist or arbitrator. *See, e.g., Electrical Workers Local 58 Pension Trust Fund v. Gary's Electric Service Co.*, 227 F.3d 646, 651-52 (6th Cir. 2000); *NLRB v. Main Street Terrace Care Center*, 218 F.3d 531, 537 (6th Cir. 2000).

Rather, the instant NLRB opinion letters construed *contractual provisions* contained within the 1994-97 collective bargaining agreement. As stated above, absent an unambiguous contrary term of the labor agreement, the courts alone have the power to construe labor contract language to determine the jurisdiction of an arbitrator to settle a labor-management disagreement. In the case at bench, the collective bargaining agreement at issue invested in the NJAB the authority to resolve jurisdictionally proper disputes, which included the authority to construe and apply the substantive articles of that agreement, subject only to restricted judicial review, as further developed below. *See* 29 U.S.C. § 173(d) ("Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement"); *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 562 (1976); *Local 58, Int'l Bhd. of Elec. Workers v. Southeastern Mich. Chap., Nat'l Elec. Contractors Assoc., Inc.*, 43 F.3d 1026, 1030

pertinent provisions of the 1994-97 labor agreement, and Architectural's affiliated Letter of Assent thereto, constitute issues of law,[6] they may be resolved by a court via summary adjudication under Fed. R. Civ. P. 56.[7]

By executing its 1994 Letter of Assent, Architectural bound itself to honor *all* covenants of the 1994-97 collective bargaining agreement, including Articles X and XII. *See Carpenters Local Union No. 345 Health and Welfare Fund v. W.D. George Construction Co.*, 792 F.2d 64, 65-66 (6th Cir. 1986) (explaining that a "compliance agreement" similar to Architectural's "Letter of Assent" was a short-form agreement whereby a non-union employer had pledged to abide by the terms of a labor contract previously negotiated between a local union and an industry employers' representative). Article X of the 1994-97 master "pre-hire" labor agreement posited that an employer, "*whether party to this Agreement independently* or as a member of a multi-employer bargaining

_____

(6th Cir. 1995).

[6] As developed herein, the meaning of each operative provision of the collective bargaining agreement related to the NJAB's jurisdiction over the instant contest, and Architectural's Letter of Assent thereto, were unambiguous in light of controlling law, and therefore were subject to judicial construction and application. "If the language [used in a contract] is unambiguous, the meaning of the language is a question of law, and the intent of the parties must be discerned from the words used in the instrument." *Taggart v. United States*, 880 F.2d 867, 870 (6th Cir. 1989).

[7] "The [summary] judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (brackets added). All legal conclusions by lower courts are scrutinized *de novo*. *Grider v. Abramson*, 180 F.3d 739, 746 n.7 (6th Cir.), *cert. denied*, 528 U.S. 1020 (1999).

unit,[8] *agree[s] to utilize and be bound by this Article.*" (Emphases added).

However, although Article X facially stipulated that each of its subparts applied to each employer governed by the master contract, the defendant has nonetheless contended that, irrespective of whether an independent employer such as Architectural had elected to participate in the "pre-hire" agreement by signing that document or by executing a Letter of Assent, Section 8 of Article X did not apply to *any employer which was not a member of the Association.* Architectural has emphasized the portion of Article X, § 8, subpt. (a), which stated that "Should the negotiations for

_____

[8] Architectural has endeavored to distinguish between non-members of the Association which had directly *executed the master labor agreement* as independent signatory employers, versus non-members of the Association, such as Architectural, which had voluntarily joined the collective bargaining agreement by *executing a separate Letter of Assent.* Architectural has conceded that, if it had directly executed the collective bargaining agreement as an independent signatory employer, it would be bound by *all* provisions of the 1994-97 collective bargaining agreement, including its "extension clause" and "interest arbitration clause." However, by instead executing the 1994 Letter of Assent, the defendant allegedly agreed only to be bound, until May 31, 1997, by the labor contract's *substantive* labor-management relations provisions; therefore, the "extension clause" and the "interest arbitration clause" assertedly cannot apply to Architectural, because, by their terms, those provisions would impose obligations upon Architectural which would extend beyond May 31, 1997.

That argument is facially misconceived, given the unambiguous language of the Letter of Assent, which stated: "It is further agreed that the signing of this letter of assent shall be as binding on the undersigned firm **as though it had signed the above referred agreement and any amendments thereto**." (boldface added). The "above referenced agreement" was the 1994-97 "pre-hire" instrument. Hence, if, as Architectural has stipulated, the "extension clause" and the "interest arbitration clause" apply to signatories of the 1994-97 collective bargaining instrument, then they also apply with equal force to Architectural, by virtue of its accession to that contract via its 1994 Letter of Assent.